INTERNATIONAL HARVESTER
EMPLOYEE CREDIT UNION,
INC., Plaintiff,

v.

Harry L. DANIEL, John F.
Daniel, Defendants.

In the Matter of Harry L. DANIEL,
Debtor.

INTERNATIONAL HARVESTER
EMPLOYEE CREDIT UNION,
INC., Plaintiff,

v.

Mason Leon POTTER, Hattie B.
Potter, Defendants.

In the Matter of Mason Leon
POTTER, Debtor.

Bankruptcy Nos. 3–80–01729, 3–81–00343.
Adv. Nos. 3–80–0724, 3–81–0256.

United States Bankruptcy Court,
S. D. Ohio, W. D.

July 16, 1981.

Christopher M. Hawk, Dayton, Ohio, for debtor Harry L. Daniel.

Barry P. Reich, Springfield, Ohio, for plaintiff.

George W. Ledford, Englewood, Ohio, Trustee.

Wilfred L. Potter, Springfield, Ohio, for debtor Mason Leon Potter.

## DECISION AND ORDER

CHARLES A. ANDERSON, Bankruptcy Judge.

### FINDINGS OF FACT

This matter is before the Court for disposition of the above Plaintiff's complaints seeking relief from the co-debtor stay imposed by 11 U.S.C. § 1301. The issue treated in this opinion has been raised in three separate adversary proceedings presently before the Court. Because the facts of these cases are similar and the legal question presented is identical, the Court combines the cases for decision.

The debtors involved in these cases are Mason Leon Potter and Harry L. Daniel; the creditor is the International Harvester Credit Union, Inc. (International). In both cases, the debtors became indebted to the creditor on a promissory note which they gave to International for the purpose of financing the purchase of an automobile. As an inducement to International to take the notes, the debtors secured the signatures of certain members of their families as codebtors on these notes. Mr. Potter enlisted the aid of his mother, Hattie B. Potter, and Mr. Daniel that of his brother, John F. Daniel. Both codebtors own real estate in Clark County, Ohio.

According to the terms of Mr. Potter's promissory note, he is to pay $51.05 per week beginning on October 19, 1979 and continuing for 260 installments. His total amount financed is $9,961.96, and the total amount to be paid under the note is $13,273.00. Mr. Daniel's contract requires him to pay $59.85 per week beginning July 13, 1979 and continuing for 260 installments. The total amount financed is $11,681.59, and the total amount to be paid under the note is $15,561.00. According to the respective complaints, Mr. Potter defaulted on his obligation owing a balance of $4,754.12, and Mr. Daniel defaulted leaving a balance due of $11,720.04. Based upon information in the record, we note that these defaults arose as a consequence of the debtors' Chapter 13 cases. There is no evidence that the debtors were in default on their contracts prior to the dates of their petitions.

As mentioned above, each of the debtors herein secured the aid of a family member as a codebtor of his note; and each of these family members is seized of title to real property which the creditor believes should sustain the burden of the debts.

### CONCLUSIONS OF LAW

The creditor claims in its complaint that it will be irreparably harmed if the Court does not lift the automatic stay of actions against the codebtors because they own real estate in the county in which the debts were incurred. Further, the creditor claims any loss of post-petition interest constitutes a potential irreparable loss. Finally, the creditor argues for relief from the stay because neither Chapter 13 plan proposes to pay 100% of its claims.

The portion of 11 U.S.C. § 1301 relevant to these proceedings provides as follows:

(c) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay pro-

vided by subsection (a) of this section with respect to a creditor, *to the extent that—*

.    .    .    .    .

(2) the plan filed by the debtor proposes not to pay such claim; or

(3) such creditor's interest would be irreparably harmed by such stay. (emphasis added)

The intention of the Congress as to the effect of that language is set forth in House Report No. 95–595 U.S.Code Cong. & Admin.News 1978, p. 5787, where it states that,

[C]reditors are prohibited from moving certain codebtors of the debtor, that is, one who has cosigned a note with the debtor.

The provision was recommended by the Commission on the Bankruptcy Laws. It is designed to protect a Chapter 13 debtor from indirect pressure from a creditor exerted through his friends or relatives, to favor or prefer that creditor. A creditor is often able to obtain a cosigner on a loan when the loan is extended. The Federal Trade Commission, in its investigation of the consumer finance industry, and the Bankruptcy Commission found that most often the cosigner is not aware of the consequences of his acting as a cosigner for the debtor. The contract is most frequently a contract of adhesion between the lender and the debtor.

A creditor with a cosigner on a note is often able to use the threat of collection from the cosigner as leverage to obtain preferential treatment from the debtor. Most often, cosigners are relatives, friends, or co-workers of the debtor, who have signed as a favor to the debtor without a full understanding of their ultimate liability on the debt. The moral pressure brought to bear on the debtor to protect his family or friends gives the creditor a significant advantage over other creditors in a way that is not related to legitimate financial considerations.

.    .    .    .    .

"[The automatic stay] will require a creditor with a cosigner to share equally in time with other creditors, and to wait for payment as all other creditors are required to do when a debtor seeks the protections of the bankruptcy laws …" The section governing the stay, also provides for relief from the stay in certain circumstances, in order to protect the creditor's rights. *If the debtor proposes not to pay a portion of the debt under his Chapter 13 individual repayment plan, then the stay is lifted to that extent.* The creditor is protected to the full amount of his claim, including postpetition interests, costs, and attorney's fee, if the contract so provides. Thus, if the debtor proposes to pay only $70.00 of a $100.00 debt on which there is a cosigner, the creditor must wait to receive the $70.00 from the debtor under the plan, but may move against the codebtor for the remaining $30.00 and for any additional interest fees, or costs for which the debtor is liable. The stay does not prevent the creditor from receiving full payment, including any costs and interest, of his claim. It does not affect his substantive rights. It merely requires him to wait along with all other creditors for that portion of the debt that the debtor will repay under the plan.

The stay is also lifted if continuance of the stay would result in irreparable injury to the creditor, such as in cases where the codebtor is deteriorating financially, by loss of his job, or where the codebtor is about to leave the jurisdiction, and would no longer be available to make good on the debt if the debtor were unable to complete payments under the plan.

House Report No. 95–595, 95th Cong. 1st Sess. (1977) p. 121–122, U.S.Code Cong. & Admin.News 1978, pp. 6082–6083 (emphasis added).

█ In reading the above section and legislative history, we are of the opinion that Congress had two main concerns when formulating the codebtor stay. First, the Congress wanted to alleviate the pressure on debtors which results when friends and

relatives are forced to pay such obligations. Second, the Congress wanted to assure creditors that they would receive the benefit of their bargains with codebtors and would not be substantially prejudiced by the codebtor stay. Unfortunately, the practical effect of Chapter 13 relief sometimes renders these concerns irreconcilable. Perhaps this would not have been the case if Chapter 13 had developed the way Congress obviously hoped it would: that is, that individuals would use Chapter 13 as a means for making their creditors whole or very nearly so. In fact, Chapter 13 has taken a much different course, at least in this Court. Most payback plans are meager at best. Some border on being in bad faith. On the other hand, creditors who have the advantage of codebtor protection are often over anxious to seek relief even where they are receiving more than such pittances under the plans. The result is that in many cases, if the court were unconditionally to terminate codebtor stays, debtors would be exposed to just that type of pressure which Congress has tried to alleviate especially where the balance due by the codebtor is a substantial portion of the claim. For this reason, we believe the stay must be fashioned so as to protect both debtors and creditors and to fulfill the Congressional findings and purpose.

◼ We believe the best means for achieving all these ends is in most cases to modify codebtor stays rather than terminate them completely. We find support for this theory in the words of § 1301(c) itself, which provides that the court must grant relief from the stay "to the extent that" the claim is not paid under the plan or the creditor will be irreparably harmed. We find that Congress's use of the limiting phrase "to the extent that" gives the court the same options contained in the general stay provisions of § 362(d), which provide for complete termination and annulment or the lesser relief of modification or conditioning of the stay.

◼ The facts of the cases at bar present situations where the automatic codebtor stay should not be terminated for all purposes. These debtors did not default on their obligations prior to filing for Chapter 13 relief. Thus, the creditor had no preexisting right to act against the codebtors. Consequently, the continued stay of any actions to collect its debt from the codebtors would not deprive the creditor of a vested substantive right under its contract. Further, in these cases the duration of the Chapter 13 plans is no longer than the original length of the subject contracts; thus, the creditor will not have to wait an extended time for the portion of the claim paid by the debtor through the plan. If the automatic stay is modified so that the codebtor must supplement the plan payments to give the creditor a combined total equal to his original contract installment, the creditor would not lose any postpetition interest, or be entitled to additional interest due to an extension of its contract term, or be deprived of the benefit of the codebtor liability.

◼ At this juncture, the only effect of a modification of the stay (rather than complete termination) is that the creditor would be denied the right to accelerate that portion of its claim not provided for under the plan in order to collect the entire lump sum from the codebtors. The legislative history does not alter the principle that Chapter 13 relief does not constitute a default which would accelerate an obligation. Our analysis of the legislative history quoted above and our opinion that the Congress intended to protect two opposing interests through § 1301 lead us to believe that the *ipso facto* acceleration of a contract upon the filing for Chapter 13 relief would hamper the effectiveness of Chapter 13. If the filing for Chapter 13 relief is deemed a default of a contract allowing the acceleration of the entire balance due, and if creditors react by moving against codebtors, then the Chapter 13 debtor obviously would be exposed to that same type of pressure which Congress wanted to avoid. We find that filing for Chapter 13 relief is not an *ipso facto* default of a contract.

Chapter 13 must be distinguished from Chapter 7 relief in this regard. Traditional-

ly, a discharge in bankruptcy has been deemed a default of a contract thereby justifying the acceleration of the entire balance due. Because a discharge under Chapter 13 is not granted until and unless the plan is completed, the debtors remain liable on their debts throughout the length of a plan. Accordingly, we do not believe the creditor here presently has the substantive right to accelerate its contract until such time as the plan is consummated or there is a dismissal or discharge.

Furthermore, since the delay is only procedural and not substantive, and not affecting the creditor's entitlement to full satisfaction, the creditor is protected by an extension of any statute of limitations to the extent that the stay prevents a timely assertion of his right against a codebtor. See 11 U.S.C. § 108(c).

The creditor is entitled to any additional interest, or costs for which the debtor is liable and not paying. H. Report No. 95–595, p. 122. Upon the entry of a discharge, any unpaid amounts of principal and interest are at that point accelerated as against the codebtors.

Turning to the issue of whether the creditor will be irreparably harmed if the stay is not lifted, we find that International did not meet its burden of proof as to this issue. International offered no evidence that the codebtors are in financial difficulty. There is no evidence that either of them is leaving the jurisdiction or losing their jobs. There is no evidence that they are wasting their realty or that it is otherwise deteriorating in value.

Although we find no evidence of irreparable harm under the facts presently before the Court, we realize that circumstances may change in the future. Therefore, the issue of irreparable harm will remain justiciable throughout the duration of the Chapter 13 cases and payments under the Plan or until discharge.

Accordingly, it is hereby ORDERED, ADJUDGED AND DECREED that the codebtor stay imposed by 11 U.S.C. § 1301 is modified so that the creditor may collect from the above defendants that amount each month which will supplement each Chapter 13 debtor's payment under his plan, so as to provide the International Harvester Employee Credit Union with the entire amount due on each installment under the subject contracts, as originally contracted.