In re Glover Russell COGAR, Jr., aka The Cogar Family Trust, aka Sunshine Diversified, Inc., aka Gente Unida, Inc., aka Western Realty, Debtor.

**FIRST FEDERAL BANK OF
CALIFORNIA, a federal
savings bank, Appellant,**

v.

Glover Russell COGAR, Jr., James
W. Coulter, Chapter 11
Trustee, Appellees.

BAP No. EC–96–1774–OHRY.
Bankruptcy No. 93–27880–A–11.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted March 20, 1997.

Filed June 27, 1997.

Mark Robbins, Epport & Richman, Los Angeles, CA, for First Federal Bank of California.

Todd M. Bailey, Sacramento, CA, for James W. Coulter, Trustee.

Before OLLASON, HAGAN and RYAN, Bankruptcy Judges.

## OPINION

OLLASON, Bankruptcy Judge.

First Federal Bank of California ("First Federal") appeals the bankruptcy court's order confirming the plan of reorganization submitted by James W. Coulter, the Chapter 11[1] Trustee (the "Trustee"). The appeal concerns, *inter alia,* the propriety of a junior lienor utilizing a plan of reorganization to transfer real property to itself from unauthorized transferees, to restructure the note between third party owners and the first deedholder, First Federal, then to require First Federal to accept assumption of the restructured note upon reconveyance of the property to the same unauthorized third party transferees. Because we hold that First Federal did not have a claim against property of the estate, **we reverse and remand.**

## FACTS AND PROCEDURAL HISTORY

First Federal is the holder of a first deed of trust on an eight-unit apartment building, 6061 Priory Street, in Bell Gardens, California, (the "property"), securing a debt of $397,647.45 plus attorney's fees of approximately $14,000. The second deed of trust is allegedly held by Transamerica Financial in the amount of $43,000. The bankruptcy estate holds a third deed of trust on the property, securing a note with an outstanding balance in excess of $95,000. For plan confirmation purposes, the parties agreed that the fair market value of the property was

$355,000. The property is owned by John and Janice Stadelwiser (the "Stadelwisers").

### Background

In February of 1991, the Bank entered into a loan agreement with Michael and Kathye Gold ("Golds") for the principal sum of $357,000. The loan was secured by a first deed of trust that was recorded on February 27, 1991. The Golds also gave First Federal an absolute assignment of rents and leases (the "assignment"), which gave First Federal the right, upon default, to enter and take possession of the property, collect rents and manage the property.

The note and deed of trust contained a due on sale clause, giving First Federal the right to accelerate the loan upon default or alienation of the property. The note and deed of trust also provided for assumption of the note by a transferee, and stated that the bank would not exercise its rights under the due on sale clause if the transferee executed an assumption agreement. The deed of trust also provided that it "can only be modified in writing and signed by Borrower and Lender."

In January of 1992, the Golds transferred the property to Armando Ponce ("Ponce"), without the authorization or knowledge of First Federal, and the parties executed a third deed of trust and assignment of rents for the benefit of the Golds. On January 17, 1992, the Golds assigned this third deed of trust and assignment of rents to Glover Russell Cogar ("Cogar") for value, and the assignment was recorded on that date. On January 30, 1993, First Federal issued a call letter, and denied Ponce's assumption application. The parties resolved this matter when Ponce agreed to transfer the property back to the Golds. First Federal and the Golds reinstated the loan and related documents.

In February of 1994, the Golds again transferred the property without First Federal's consent or knowledge to the Stadelwisers. After allegedly learning about the transfer in December of 1994, First Federal

---

**1.** Unless otherwise indicated, references to "Chapter," "Section" or "Code" are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330.

accelerated the note, but in the alternative gave the Stadelwisers an opportunity to assume the loan; their assumption application was not approved by First Federal for alleged noncompliance with the terms. The loan was placed in foreclosure, since First Federal was not accepting payments from the Stadelwisers and the loan payments were in arrears after June 1, 1995. First Federal subsequently incurred approximately $28,400 in foreclosure preparation costs.

Meanwhile, on September 15, 1993, a Chapter 11 bankruptcy petition was filed by Glover Russell Cogar, Jr., aka The Cogar Family Trust, aka Sunshine Diversified, Inc., aka Gente Unida, Inc., dba Western Realty ("Debtor"). The Trustee was appointed on December 29, 1993. The bankruptcy schedules did not mention Debtor's third deed of trust nor list the property as an asset of the bankruptcy estate; the schedules were never amended to do so.

On July 27, 1995, the Trustee alleged that First Federal was informed of Debtor's junior lienor status and that Debtor's bankruptcy case was pending. Thereafter, on August 30, 1995, First Federal filed in state court a complaint seeking a foreclosure order, turnover of the rents, and appointment of a receiver. It also filed an *ex parte* application for the appointment of a receiver and a temporary restraining order, which was denied without prejudice to an equitable showing. On September 5, 1995, First Federal obtained a temporary restraining order, and an order to show cause regarding the appointment of receiver and issuance of preliminary injunction. Trustee's counsel wrote a letter to First Federal informing it that its actions were in violation of the automatic stay; First Federal received the letter on September 15, 1995. On September 20, First Federal appeared at the hearing in state court, and an order appointing a receiver and enjoining actions related to the property was entered thereafter.

On September 29, 1995, Trustee's counsel wrote to First Federal informing it that its actions could result in sanctions for violating the automatic stay. First Federal received a copy of Debtor's bankruptcy petition and schedules in early October, 1995. First Federal alleged that it had no notice the property might be part of Debtor's bankruptcy estate until it received the Order Approving Disclosure Statement and Fixing the Time for Filing Acceptances or Rejections of Plan in December, 1995.

### The Motions for Stay Relief

On January 3, 1996, Trustee's counsel warned First Federal a third time, and informed it of the estate's plan to obtain title to the property from the Stadelwisers. Since the property and the rents were in the possession and control of the state-appointed receiver, First Federal responded with a threat of contempt, and also threatened the Stadelwisers with contempt if they cooperated with the Trustee in his plans to transfer the property to the estate.

On January 17, 1996, First Federal filed its first motion for relief from the automatic stay. or, in the alternative, for adequate protection. First Federal's appraiser declared the value of the property to be $355,000, which the Trustee subsequently accepted, and valued its secured debt as $426,047.45 (including $28,400 in costs of foreclosure). With the $40,000 second lien, First Federal alleged that there was no equity in the property. It also alleged that the property was not necessary for a successful reorganization because the plan was unconfirmable and proposed in bad faith.

The Trustee opposed the motion, and contended that First Federal willfully violated the automatic stay by continuing its receivership and other state court actions. As part of this motion, the Trustee made demands for production of documents, which First Federal initially refused to produce. The Trustee was forced to prepare discovery pleadings and orders before First Federal produced the documents, and paid copying costs. The Trustee argued that he was entitled to payment of these expenses as a sanction for First Federal's willful violation of the automatic stay. In addition, he contended that the bankruptcy court had the authority under § 105(a) to order First Federal to pay attorney's fees and costs as part of undoing the stay violation.

The motion for stay relief was heard on February 12, 1996.[2] Without dealing with the merits, the bankruptcy court determined that First Federal's actions constituted a violation of the automatic stay and ruled that First Federal must undo its stay violation before it would be entitled to stay relief. The bankruptcy court then denied First Federal's request for a continuance. A minute entry order denying the motion for stay relief was entered on February 20, 1996.

First Federal then proceeded to: (1) terminate the receivership; (2) dissolve the preliminary injunction; (3) turn the property over to the Stadelwisers; and (4) forbear publishing its notice of trustee's sale.

First Federal filed its second motion for stay relief or, in the alternative, for adequate protection on March 14, 1996. First Federal contended that it was not a creditor of the Debtor or the Stadelwisers. It also argued that there was no legal basis for the estate to utilize the property for reorganization.

The Trustee opposed the motion, and filed the additional declaration of attorney Todd Bailey ("Bailey"). Bailey stated that First Federal had "not offered" to pay the Trustee's attorney's fees and costs incurred by the stay violation. Bailey averred that the Trustee incurred fees of $8,866.50 in professional time related to First Federal's motion for stay relief, and copying costs of $251.40. The opposition was also supported by declarations in support of the Trustee's plan of reorganization by Cogar, Janice Stadelwiser and Bailey to counter First Federal's objections to the plan.

2. Apparently, the plan, disclosure statement, and the declaration of First Federal's attorney, among other documents, were part of the record at the hearings on the motions for stay relief subsequently filed by First Federal.

3. The parties subsequently entered into a stipulation, approved by the bankruptcy court on September 18, 1996, which preserves the status quo pending disposition of both appeals. The stipulation provides that the effective date of the plan as to First Federal will be 14 days after the date the BAP issues its decision in the related confirmation appeal or the date the BAP issues its decision in a motion for stay pending appeal of that disposition, whichever is later. It further provides that even if the confirmation order is reversed, the plan will be effective as to all other creditors.

The hearing on the second motion for stay relief took place on April 8, 1996. The Trustee contended that First Federal did not completely undo its stay violation because it did not pay the Trustee's fees and costs incurred in getting First Federal to undo the violation. The bankruptcy court heard argument on the merits, including First Federal's objections to the plan, which was scheduled for a confirmation hearing the next day. First Federal moved for a continuance so that it might work out the payment with the Trustee, and attempted to argue the merits, but the court denied the motion, effectively stating that the time to make amends had passed. Ultimately, the bankruptcy court denied the motion on the grounds that First Federal failed to undo a willful violation of the automatic stay by paying the Trustee's fees and costs. The court's minute entry order denying the motion for stay relief was entered on April 12, 1996. First Federal timely appealed the order, which is the related appeal, Bankruptcy Appellate Panel ("BAP") No. EC–96–1396 (unpublished memorandum decision filed on June 27, 1997).[3]

### The Chapter 11 Plan

The Trustee's plan was filed on November 5, 1995, and modified on March 25, 1996. Under the plan, First Federal's alleged claim was valued at $397,647.45, plus attorney's fees. The plan provided that the note between the Golds and First Federal would be restructured ("Restructured Secured Note") in the amount of $355,000, less any tax liens,[4] and secured by the restructured first deed of trust.[5] The Restructured Secured Note

4. A preliminary title report indicated 1995–1996 taxes in the amount of $7,366.94.

5. To the extent that First Federal's claim exceeded $355,000, the plan provided that First Federal would have a general unsecured claim. There would be four general unsecured classes which were treated identically—they would receive seven percent interest payments on the allowed unsecured claims; these classes voted for the plan. However, First Federal stated at the April 8, 1996, hearing on the stay relief motion that it intended to make the § 1111(b) election, in which case it would not have an unsecured deficiency claim.

would be without recourse, would not contain a due on sale clause nor a right to accelerate. The plan further provided that after confirmation, the Stadelwisers would transfer the property to the Trustee or Disbursing Agent. After clearing title, the Trustee would sell the property to the Stadelwisers, subject to First Federal's modified lien, in exchange for the execution of an all-inclusive note in the amount of $395,000 plus the Trustee's attorney's fees for services in connection with these transactions. The Trustee's deal with the Stadelwisers would add some $40,000 to the estate, (all-inclusive note in the amount of $395,000 minus $355,000).

In support of the plan, the Trustee filed the declarations of Cogar and Janice Stadelwiser. Cogar averred that he informed a representative of First Federal on July 27, 1995, that he held the third trust deed on the property and had filed bankruptcy, and he faxed a copy of the bankruptcy petition and trust deed to First Federal.

First Federal filed its written opposition to the plan and disclosure statement, and filed the declaration of its attorney, Francis C. Hung, Jr. ("Hung"). Hung averred that First Federal proceeded with the receivership because it had not received proof that the property was part of the bankruptcy estate.

A hearing on the plan confirmation began on April 9, 1996. First Federal was the only impaired class that opposed the plan. First Federal argued, *inter alia*, that Debtor's lack of ownership of the property prevented the estate from restructuring its loan documents. The Trustee countered that Debtor's third deed of trust was a sufficient property interest to allow modification of First Federal's lien. A continued evidentiary hearing followed on June 21, 1996.

**6.** This appeal raises several other issues that do not need to be addressed in light of our disposition. These include the Trustee's standing to modify the note as a nonparty to the contract, as well as plan objections such as whether the plan: (1) was feasible; (2) was fair and equitable, or violated the absolute priority rule; (3) was in the best interest of creditors; and (4) was proposed in good faith.

The bankruptcy court overruled First Federal's objections and, on July 30, 1996, the bankruptcy court entered its order confirming the Trustee's plan. First Federal timely appealed the order.

## ISSUE [6]

The sole issue on appeal is whether First Federal had a claim against property of the estate which could be modified by the Trustee's plan of reorganization.

## STANDARD OF REVIEW

■ The Panel reviews questions of law *de novo* and findings of fact for clear error. *In re Perez*, 30 F.3d 1209, 1212 (9th Cir. 1994). Whether property is property of the estate is a question of law to be reviewed *de novo*. *In re Bibo, Inc.*, 200 B.R. 348, 350 (9th Cir.BAP 1996).

■ An order approving a reorganization plan is reviewed for an abuse of discretion. *In re Pine Mountain, Ltd.*, 80 B.R. 171, 172 (9th Cir.BAP 1987). A court abuses its discretion "when it bases its decision on an erroneous view of the law or a clearly erroneous view of the facts." *Lewis v. Telephone Employees Credit Union*, 87 F.3d 1537, 1557 (9th Cir.1996).

## DISCUSSION

■ First Federal contends that the Trustee's plan was unconfirmable as a matter of law because the Trustee did not have standing [7] to restructure First Federal's and the Golds' loan documents or to accept an unauthorized transfer of and reconvey the property. It points out that Debtor did not schedule the property as property of the estate, and Debtor was not the titleholder.

First, we must examine the nature of the estate's interest and rights, if any, in the

**7.** Standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). To have standing a party must assert its own legal rights and interests and cannot rest its claim to relief on the legal rights or interest of third parties. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982).

property. Next, we must determine whether First Federal is a creditor of the estate, such that it had a claim treatable in the plan. *See* § 1123(a)(3) (stating that a Chapter 11 plan shall "specify the treatment of any class of claims or interests that is impaired under the plan"). In addition, § 1123(a)(5) provides that the plan may be implemented as to property of the estate by selling "all or any part of the property of the estate, either subject to or free of any lien . . . ." or by the "satisfaction or modification of any lien." Sections 1123(a)(5)(D) and (E).

■ While state law determines the nature and extent of a debtor's interest in property, *In re Farmers Markets, Inc.,* 792 F.2d 1400, 1402 (9th Cir.1986), once that determination is made, federal bankruptcy law dictates if the interest is property of the estate. *See In re King,* 961 F.2d 1423, 1426 (9th Cir.1992); § 541(a).

■ Under § 541(a), at the time a debtor files bankruptcy, all of the debtor's property becomes property of the bankruptcy estate. *Taylor v. Freeland & Kronz,* 503 U.S. 638, 642, 112 S.Ct. 1644, 1647–48, 118 L.Ed.2d 280 (1992). Property is defined broadly and includes "charges on property, such as liens held by the debtor on property of a third party, or beneficial rights and interest that the debtor may have in property of another." 124 Cong.Rec. H11,096 (daily ed. Sept. 28, 1978) (Statement of Rep. Edwards); *In re Bialac,* 712 F.2d 426, 431 (9th Cir.1983).

■ At the time of the bankruptcy filing, Debtor did not own the property. Indeed, Debtor did not list the property as an asset on his schedules. The bankruptcy estate will not own the property until it is transferred to the Trustee pursuant to the terms of the plan. Ownership resides in the Stadelwisers, a third party, who have agreed to transfer title after plan confirmation to the Trustee so he can modify the original loan terms.

Under these facts and California law, the Trustee had a lien interest in the property. *In re Capital Mortg. & Loan. Inc.,* 35 B.R. 967, 970 (Bankr.E.D.Cal.1983). The interest included the following rights: the right to rents of the property on default; the right to foreclose on default; the right to purchase the property at a foreclosure sale; the right to possession of the property with the consent of the owners; the right to title to the property with the consent of the owners; and the right to cure defaults owed to senior creditors. *See* Cal. Civ.Code §§ 2920(a), 2924c(a)(1), 2927 (West 1993 & Supp.1997).

■ The lien interest is property of the estate:

[A] bankruptcy estate is comprised of all legal and equitable interest in debtor's property as of the filing of the bankruptcy petition. Therefore, since a lien is considered a beneficial or equitable interest in property, and it was in existence prior to the debtor's filing bankruptcy, the lien interest is considered part of the bankruptcy estate.

*Capital Mortg.,* 35 B.R. at 970. *See also Bibo,* 200 B.R. at 350.

■ The Trustee contends that, by virtue of Debtor's lien interest, First Federal, as the senior lienholder, had a claim against the estate. Absent an overriding federal interest, the existence of a claim in bankruptcy is generally determined by state law. *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979). "Claim" is broadly defined in § 101(5) as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; . . .

"Right to payment" means " 'nothing more nor less than an enforceable obligation.' " *Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 2153–54, 115 L.Ed.2d 66 (1991) (quoting *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 559, 110 S.Ct. 2126, 2131, 109 L.Ed.2d 588 (1990)). Furthermore, § 102(2) establishes that a claim against the debtor includes a claim against "property of the debtor." Congress contemplated that this section would apply to

"nonrecourse loan agreements where the creditor's only rights are against property of the debtor, and not against the debtor personally." [ ]. Insofar as the mortgage interest that passes through a Chapter 7

liquidation is enforceable only against the debtor's property, this interest has the same properties as a nonrecourse loan.... [W]e understand Congress' intent to be that § 102(2) extend to all interests having the relevant attributes of nonrecourse obligations regardless of how these interests come into existence.

*Johnson,* 501 U.S. at 86–87, 111 S.Ct. at 2155 (citations omitted).

The nonrecourse nature of the restructured loan debt would not prevent First Federal's alleged claim from being a claim, but the fact that Debtor did not own the property would preclude a "claim."

In *Johnson,* the Supreme Court upheld the Chapter 13 debtor's right to discharge the bank's *in rem,* nonrecourse claim following discharge of his personal liability on the note in a Chapter 7 liquidation. Id. at 86–87, 111 S.Ct. at 2155–56 (citations omitted). *Johnson* is distinguishable from these facts, however, because there the debtor owned the property. Ownership is a necessary prerequisite to the existence of a First Federal claim against the estate. *See In re 680 Fifth Ave. Assocs.,* 29 F.3d 95, 98 (2nd Cir.1994) (where secured creditor held purchase money lien on real property owned by debtors, and debtors acquired the property subject to the lien but had not assumed the mortgage or executed a debt instrument, court held that creditor had a deficiency claim); *In re Hutcherson,* 186 B.R. 546, 551 (Bankr. N.D.Ga.1995) (mortgagee holds claim against debtor-daughter's estate by virtue of devise of property from mother-mortgagor); *In re Threats,* 159 B.R. 241, 242 (Bankr.N.D.Ill. 1993) (debtor obtained property in violation of due on sale clause; court held that creditor did have a claim against the estate); *In re Lumpkin,* 144 B.R. 240, 242 (Bankr. D.Conn.1992) (mortgagee's right to payment in the form of a proceeds and a right to foreclose are sufficient to constitute a claim against bankruptcy estate of grantee-daughter who did not assume the note).

In fact, the Trustee has not cited any cases where a debtor who did not own the property was allowed to modify the mortgage, cure a default or restructure the loan between the creditor and a third party which it had not

properly assumed. *See In re Foxcroft Sq. Co.,* 184 B.R. 671, 676 (E.D.Pa.1995) (court allowed *transferees* with no privity to restructure lien pursuant to *Johnson* ).

■ The Trustee's numerous arguments can be reduced to two main propositions. First, the Trustee contends that First Federal has a contingent claim against the estate because of its rights as a senior lienholder to any sale proceeds and equitable remedies. Once the property is transferred, those remedies would no longer be contingent if there were a default under the all-inclusive note. Thus, he contends that the timing of the transfer of the property is irrelevant.

■ A contingent claim is a debt "which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor." *In re Fostvedt,* 823 F.2d 305, 306 (9th Cir.1987). By providing for a broad definition of "claim," Congress intended to ensure that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Cong., 2d Sess. 1, 309 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266; S.Rep. No. 989, 95th Cong., 2d Sess. 21–22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5807–08. This policy promotes the debtor's fresh start. *See Ohio v. Kovacs,* 469 U.S. 274, 279, 105 S.Ct. 705, 707–08, 83 L.Ed.2d 649 (1985).

First Federal's alleged claim is not a true contingent claim, nor does it promote the policy to deal with all of the estate's legal obligations. Debtor is a creditor of the Stadelwisers, not the other way around, and the Stadelwisers are not in bankruptcy. Debtor's obligation to First Federal would not occur until the property is transferred. Thus, the controlling event in this scenario is the confirmation of the reorganization plan which enables the event creating Debtor's liability to occur.

To allow this practice would be bad policy. A debtor could force a party's involvement in the bankruptcy by providing for treatment of a "contingent" claim in the plan, which is not truly contingent until the plan is confirmed.

Any liability of the debtor would not be dependent on "an extrinsic event" but a contrived event. *See* BLACK'S LAW DICTIONARY, at 529 (5th ed.1979) (defining "extrinsic" as "[f]oreign; from outside sources"). This could lead to collusion of the debtor with third parties against other third parties, just what First Federal accuses the Trustee of doing in this case. The Code did not intend to stretch the broad definition of a contingent claim to such a meaningless realm.

■ Nevertheless, the Trustee further contends that he has the present right under state law to accept title in lieu of foreclosure in settling the estate's lien interest with the Stadelwisers; thus he has the right to provide for the remedy in the plan. He contends that once the property is transferred to the Trustee, First Federal would necessarily have a contingent claim against property of the estate which must be dealt with in the plan, so First Federal must have a present contingent claim.

Section 1123(b)(3) controls the content of a reorganization plan. It allows, "[s]ubject to subsection (a)," for "(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or (B) the retention and enforcement by the . . . trustee . . . of any such claim or interest." Section 1123(b)(3).

We have found no case law where this section was applied to the foreclosure or deed-in-lieu of foreclosure of a debtor's junior lien interest. The important language in subsection (b) for purposes of this case is "[s]ubject to subsection (a)." As stated earlier in this opinion, subsection (a) allows the plan to provide for a sale of and modification of liens relating to property of the estate. *See In re Keller*, 157 B.R. 680, 685–86

(Bankr.E.D.Wash.1993) (refusing to confirm a reorganization plan that compelled a creditor to release liens against a nondebtor's property).

Even if the Trustee were entitled to settle its lien interest in the plan by accepting title to the property from the owners, the transferred property would be *after-acquired property.*[8] By definition, this after-acquired property would not be property of the estate, as determined at the time of the bankruptcy filing. *See* § 541.

The estate's contingent foreclosure rights would not give First Federal a contingent claim for the same reason.[9] First Federal had an "enforceable obligation" from the junior lienor by way of lien satisfaction from redemption payment or sale proceeds only if Debtor had foreclosed upon the property or sold the property prepetition.

■ Secondly, the Trustee contends that First Federal has a claim against the estate by virtue of First Federal's power to foreclose, which would transform the Trustee's present interest. The Trustee finds *Bibo*, a recent BAP opinion, dispositive. *Bibo* held that a junior lienor's interest was property of the bankruptcy estate which could be affected by a foreclosure action by a senior lienor. *Bibo*, 200 B.R. at 351. The Panel stated:

> [T]he effect of the foreclosure proceeding is not only to foreclose [the owner's] interest in the property, but the debtor's lien as well. In other words, while [the owner's] fee interest and Debtor's lien may be separate and distinct interests, both would be eliminated by [the lender's] foreclosure of its trust deed.

*Id.*

The Panel further stated:

> the estate. The estate would also take the property subject to the senior liens. *Romo v. Stewart Title of Cal.*, 35 Cal.App.4th 1609, 42 Cal.Rptr.2d 414, 418 (1995). A potential foreclosure of a valueless lien and encumbered property would defy reason and is hardly a right which would create a contingent First Federal claim. The Trustee's plan to take title in lieu of foreclosure does not change the nature of First Federal's status as a senior lienholder of the property but not a claimholder of the estate.

8. According to the plan, the property of the estate will not revest in the Debtor upon confirmation but will remain estate property. *See Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 587 (9th Cir.1993) (upon confirmation the assets revest in the name of the reorganized debtor and are no longer property of the estate unless the plan provides otherwise).

9. In addition, the Trustee's third lien, apparently, is wholly unsecured. In a foreclosure, the Trustee would likely take the property by full credit bid, thereby eliminating the Stadelwiser's debt to

In the case at bar Debtor's interest would be reduced from a lien securing a right to repayment to a right to redeem the subject property.... Instead of receiving payment from the owner, or from the proceeds of a sale or refinance, Debtor would have to pay the entire amount [the owner] owed to Monumental in order to receive anything on account of its lien. This is a sufficient impact on Debtor's interest to make foreclosure subject to the stay....

*Id.*

*Bibo* drew a distinction, however, between a lien interest and an interest in the land itself, and stated: "[I]t is not necessary that the Debtor's interest be some species of 'ownership' ... to be affected by a foreclosure." *Id.* at 350–51 (citing *In re March,* 140 B.R. 387, 388–89 (E.D.Va.1992), *aff'd,* 988 F.2d 498 (4th Cir.), *cert. denied sub nom. Kittay v. Farmers Bank,* 510 U.S. 864, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993)). *Bibo* held that the lien interest was entitled to the protection of the automatic stay.

 The Trustee contends in his opening brief that, in recognizing the control of the senior lienor over the junior interest, *Bibo* "in effect ... held that a creditor with a lien against property that is senior to the lien held by the debtor has a claim against property of the debtor." We cannot agree with this extrapolation of *Bibo.* Nor can we agree that the definition of "claim" should be circumscribed by § 362 and the automatic stay provisions. The Trustee might just as well have made a *per se* rule that every violator of the automatic stay who can exercise control over the debtor or property of the debtor is also a creditor of the bankruptcy estate. That is not necessarily so, and is not in conformance with the Code.

In summary, First Federal did not hold a claim against the bankruptcy estate which was subject to treatment in the Chapter 11 plan. The real property was not property of the estate, as opposed to the estate's lien interest in the property.

## CONCLUSION

The estate's third priority lien interest in the property was property of the estate, however the property itself was not property of the estate. First Federal did not have a contingent claim against the estate by virtue of an event controlled by the Trustee, *i.e.,* the planned postpetition transfer of the property. First Federal's unexercised rights as a senior lienholder of property owned by a third party did not make First Federal a creditor of the estate of the junior lienholder. Since First Federal was not a claimholder in Debtor's bankruptcy case, the Trustee did not have standing to restructure First Federal's loan documents in the plan provisions. The bankruptcy court's order confirming the modified plan is **REVERSED,** and the matter is **REMANDED** for proceedings in accordance with this decision.