**In re Donald Ray CARBAUGH, Debtor.**

**Joan Carbaugh, Plaintiff–Appellee,**

**v.**

**Donald Ray Carbaugh, Defendant–Appellant,**

**Joseph I. Wittman, Trustee, Defendant–Appellee.**

**BAP No. KS–01–029.**
**Bankruptcy No. 99–42350.**
**Adversary No. 00–7001.**

United States Bankruptcy Appellate Panel of the Tenth Circuit.

May 1, 2002.

Charles R. Hay of Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for Defendant–Appellant.

Joseph I. Wittman, Trustee, pro se.

Eric C. Rajala, Overland Park, KS, for Plaintiff–Appellee.

Before McFEELEY, Chief Judge,

CORNISH, and CORDOVA[1], Bankruptcy Judges.

## OPINION

MCFEELEY, Chief Judge.

Appellant/Debtor Donald Ray Carbaugh, ("Debtor") appeals the Judgment entered by the United States Bankruptcy Court for the District of Kansas, which 1) determined that funds held in the Debtor's Hallmark Retirement Plan were not property of the bankruptcy estate; 2) determined that funds in a brokerage account that were withdrawn from the Debtor's Hallmark Retirement Plan were property of the estate and were not exempt; and 3) granted relief from the automatic stay to the Plaintiff/Appellee, Joan Carbaugh ("Appellee") for the purpose of pursuing state court litigation to determine the nature of Appellee's interest in the Hallmark Retirement Plan under the parties' Separation Agreement.

## I. *Appellate Jurisdiction*

The Bankruptcy Appellate Panel has jurisdiction over this appeal. The bankruptcy court's judgment disposed of the adversary proceeding on the merits and is a final order subject to appeal under 28 U.S.C. § 158(a)(1). *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). The Debtor timely filed his notice of appeal pursuant to Federal Rule of Bankruptcy Procedure 8002. All parties have consented to this Court's jurisdiction by failing to elect to have the appeal heard by the United States District Court for the District of Kansas. 28 U.S.C. § 158(c)(1); Fed. R. Bankr.P. 8001.

## II. *Standard of Review*

■ "For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable de novo), questions of fact (reviewable for clear error), and matters of discretion (reviewable for 'abuse of discretion')." *Pierce v. Underwood*, 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); see Fed. R. Bankr.P. 8013; *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1370 (10th Cir. 1996).

■ Whether funds are property of the estate is a question of law and is reviewed de novo. *See In re Cogar*, 210 B.R. 803, 808 (9th Cir. BAP 1997).

■ Whether a bankruptcy court has erred in lifting the stay is reviewed for abuse of discretion. *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 31 F.3d 1020, 1023 (10th Cir.1994). "Under the abuse of discretion standard: 'a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir.1994) (quoting *McEwen v. City of Norman*, 926 F.2d 1539, 1553-54 (10th Cir.1991) (further quotation omitted)).

## III. *Background*

The Debtor and the Appellee were divorced on April 15, 1982. The Journal Entry for the Divorce filed in Douglas County, Kansas incorporates by reference a Separation Agreement filed March 16, 1982. At that time Debtor was employed by the Hallmark Corporation. In 1982 there were three retirement plans in place

---

**1.** Honorable Donald E. Cordova, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Colorado, sitting by designation.

for Hallmark employees: a Retirement Plan, an Employee Profit Sharing and Ownership Plan, and a Thrift Plan (collectively "Hallmark Plans," unless referred to individually). It is undisputed that the Hallmark Plans were and are qualified under the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 829, as amended, 29 U.S.C. § 1001 *et seq.*[2] At the time of the formation of the Settlement Agreement the Appellee was to receive 50% interest in the Retirement Plan,[3] which, at that time, was estimated to be about $27,000. In 1982 there was no federal law authorizing the administrator of an ERISA-qualified retirement plan to segregate the interest of a plan beneficiary's ex-spouse from the interest of the beneficiary. The ERISA amendment that

established the Qualified Domestic Relations Order ("QDRO") procedure for allowing retirement plan administrators to make direct payment of retirement plan benefits to ex-spouses of plan beneficiaries was not enacted until 1984.

In 1992, the Appellee requested assurance from Hallmark Cards that her share would be distributed to her at the time of the Debtor's withdrawal. In 1992, Hallmark found that the Separation Agreement did not meet the requirements to enable it to treat the Appellee as an alternate payee for the purposes of the Hallmark Plans. Two years later, Hallmark confirmed to the Debtor, with a copy to the Appellee, that the Divorce Order was insufficient to qualify as a QDRO.

2. The Hallmark retirement plans were and are tax qualified under Internal Revenue Code section 401(a), and they have the non-alienation provisions necessary under ERISA. Section 8.01 of the profit sharing plan provided, in pertinent part:

NON–ALIENATION OF INTEREST IN TRUST—No Participant shall have any power to assign, transfer, pledge, encumber, or alienate any interest in the Trust. Any attempt to do so shall be void. Such an interest shall not be subject to levy, attachment, garnishment or other legal process to enforce payment of any claim against a Participant.

Employee Profit Sharing and Ownership Plan of Hallmark Cards, Inc. at 27–28, *in* Appellant's App. at 116l-m.

Similar language appears in Section 10.01 of the Retirement Plan, Retirement Plan at 41, *in* Appellant's App. at 116f, and Section 8.01 of the Thrift Plan, Thrift Plan of Hallmark Cards, Inc. at 24, *in* Appellant's App. at 116p.

3. The portion of the Settlement Agreement that pertains to the Retirement plans provides:

[the Debtor] shall have as his sole and separate property free and clear of any claim of the wife [Appellee], except as set out herein, his profit sharing and retirement benefits at Hallmark Cards, Incorporated. The following shall be the restrictions:

(a)(i) The wife is hereby given a one-half interest in the profit sharing and ownership plan and retirement benefits of the husband which have accrued to date. The parties agree for the purpose of this agreement that such one-half interest has a present value of $27,000.00. Upon husband [Debtor] qualifying to receive any of such benefits through retirement, termination, death or for any other reason, wife shall receive from husband payment of her proportionate share of such benefits including interest on the present value of wife's one-half interest at a rate of interest equal to the average of the annual rate of return earned by the trustee of the employee profit sharing and ownership plan of Hallmark Cards, Incorporated, for the years 1982 and all succeeding years up unto the year in which such benefits are to be received.

(ii) If husband receives such payments in a lump sum, he shall make payment to wife of her share within thirty (30) days of receipt of said amount. If husband receives such payments in monthly increments, he shall within ten (10) days of receipt of such increments pay over to the wife her share therefrom. The parties agree to cooperate in the actual determination of the sums to be paid when they become due. Wife shall have a judgment against the husband hereby for those amounts.

Separation Agreement at 2–3, *in* Appellant's App. at 96–97.

On May 18, 1995, the Appellee initiated a proceeding in the District Court of Douglas County, Kansas ("state court"), requesting the following relief: 1) a restraining order to enjoin Hallmark Cards from distributing any amounts from the Hallmark Plans to the Debtor; and 2) a determination of the amount owed her under the Separation Agreement. The state court denied the application for a restraining order. After a hearing on December 14, 1995, the state court entered an Order ("state court Order") describing how the Appellee's interest in the Hallmark Plans was to be determined. Objecting to the state court's determination of the interest rate on the funds allocated to her pursuant to the Separation Agreement, the Appellee appealed the state court Order to the Kansas Court of Appeals, which affirmed the state court on June 12, 1998. Before the Debtor filed his bankruptcy petition, a hearing had been scheduled in the state court for the purpose of implementing the state court Order. After the Debtor filed his petition with the bankruptcy court, the hearing was cancelled.

On December 31, 1997, the Debtor retired from Hallmark Cards. In 1998, the Debtor received a portion of his retirement benefits in a lump sum distribution of $97,436.70 from the Hallmark Plans. After paying taxes on that sum, he invested the remaining monies in an account with Berthel Fisher & Co ("BFC account"). No other funds have been put into the BFC account. The amount remaining in the Hallmark Plans could be distributed to him if he so requested.

On October 15, 1999, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. The Debtor's schedules list an account balance in the Hallmark Plans[4] as exempt under Kansas law, Kan. Stat. Ann. § 60–2308(b). He also listed the BFC account[5] as exempt under Kansas law, Kan. Stat. Ann. §§ 60–2308(b) and 60–2310.

In his petition, the Debtor scheduled two debts: a credit card obligation to VISA in the amount of $2,400 and a disputed debt to the Appellee in the amount of $109,000.

The Appellee filed a proof of claim based on the Separation Agreement, listing the dollar amount as unknown. The Appellee also filed an objection to the Debtor's exemptions. Finally, the Appellee moved for relief from the automatic stay and initiated an adversary proceeding to seek a determination as to the dischargeability of her claim and also a declaratory judgment as to her interest, if any, in the Debtor's account balance in the Hallmark plans. The Trustee also objected to the Debtor's exemption of the BFC account.

In a hearing held on April 11, 2001, the bankruptcy court granted the Appellee's Stay Relief Motion and determined that the funds in the BFC account were not exempt. At the hearing, the bankruptcy court announced its findings and conclusions, which were later memorialized in a judgment. The bankruptcy court found that the Debtor's interest in the Hallmark Plans was not property of the estate. The bankruptcy court further found that the BFC account funds were not exempt under ERISA, nor were they exempt as wages. The Court abstained from resolving the dispute about the parties' respective interests in the Hallmark Plans under the Separation Agreement and lifted the stay to

---

4. On Schedule B, he identifies the Hallmark Plans as a Profit sharing plan and lists the current market value of this asset as $481,-666,27.

5. The Debtor estimated the value of this asset as $51,042.46 on October 30, 1998.

allow the Appellee to seek resolution of this dispute in state court. In conclusion, the bankruptcy court held that whether any of the debt was dischargeable was not yet ripe for review and ordered the trustee to hold the BFC account funds pending resolution by the state court of the dispute before it.

## IV. *Discussion*

On appeal, the Debtor argues that the bankruptcy court erred in its determination that the Hallmark Plans were not property of the estate and that the funds in the BFC account were not exempt. The Debtor also argues that the bankruptcy court abused its discretion when it lifted the stay under 11 U.S.C. § 362[6] to permit the Appellee to proceed with state court litigation.

First, the Debtor contends that the funds in the Hallmark Plans should be included within property of the estate based either on his vested interest in them or on his entitlement to a state law exemption in pension plans.

■ Section 541(a)(1) provides that all "legal or equitable interests of the debtor in property" become property of the estate. 11 U.S.C. § 541(a)(1). With a few enumerated exceptions, only property that a debtor has a legal or equitable interest in at the time of the filing of the petition becomes property of the estate. *Id.* Specifically excluded from property of the estate is any interest of the Debtor that fits within the requirements of § 541(c)(2). In pertinent part, § 541(c)(2) provides that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this

title." 11 U.S.C. § 541(c)(2). In *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), the Supreme Court found that funds held in ERISA-qualified plans constitute one form of the property described in § 541(c)(2). *Patterson*, 504 U.S. at 760, 112 S.Ct. 2242 (holding that the anti-alienation provision required for ERISA-qualification constitutes a trust enforceable under applicable non-bankruptcy law). Under *Patterson*, a debtor's interest in an ERISA-qualified plan is "completely excluded from the bankruptcy estate." *Orr v. Yuhas (In re Yuhas)*, 104 F.3d 612, 614 (3d Cir.1997).

■ The bankruptcy court found that the funds in the Hallmark Plans were not property of the estate because at the time the Debtor filed his Chapter 7 petition, the funds remained in an ERISA-qualified plan and under § 541(c)(2) were excluded from the estate. We agree. The Debtor's argument that he had vested in the Hallmark Plans and therefore had a legal right to collect the funds is immaterial. What is important is that at the time he filed for bankruptcy he had not collected the funds; they remained in an ERISA-qualified trust. By definition, monies within an ERISA-qualified trust fall within the exception established in § 541(c).

■ Debtor also argues that the Hallmark Plans funds are property of the estate because the Debtor might be entitled to a state law exemption of them. That the Debtor might have been entitled to exempt the funds if they were within his estate is irrelevant. Exemptions may only be claimed on property that is property of the bankruptcy estate. *See Owen v. Owen*, 500 U.S. 305, 308, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991) (finding "[n]o property

**6.** All future statutory references are to Title 11 of the United States Code unless otherwise noted.

can be exempted (and thereby immunized), however, unless it first falls *within* the bankruptcy estate."). Because the Hallmark Plans monies are not within the estate, we will not speculate about whether the Debtor could have claimed them exempt.

■ Next, the Debtor argues the bankruptcy court erred when it found that the BFC account was not exempt. The Debtor focuses on the fact that the BFC account was comprised solely of uncommingled funds distributed from the Hallmark Plans. He argues that because these funds were uncommingled, they kept their protected status under ERISA. For this argument, the Debtor first relies on the Supreme Court case, *Boggs v. Boggs*, 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997).

In *Boggs*, the sons of Dorothy and Isaac Boggs, after the death of first Dorothy and then Isaac, attempted to recover from Isaac's second wife and beneficiary of his pension plan both a survivor's annuity and a distribution of pension property made to Isaac during his lifetime, on the grounds that they had inherited it from Dorothy by virtue of a testamentary transfer to them of her interest in the assets under Louisiana's community property laws. *Id.* at 836–37, 117 S.Ct. 1754. The Court held that the second wife's ERISA beneficiary interest under the pension plan trumped the first wife's community property interest. *Id.* at 841, 117 S.Ct. 1754. The Court reasoned that the anti-alienation provision in ERISA, which prohibits assignment or alienation of any interest enforceable against a plan, prevented the first wife from making a testamentary transfer of

undistributed funds. *Id.* at 851–52, 117 S.Ct. 1754.

Here, the Debtor suggests that because ERISA preempts state law under *Boggs*, his uncommingled BFC funds remain protected by ERISA. There is nothing in *Boggs* that supports that proposition. In *Boggs*, the issue was whether a first wife could transfer or assign a community property interest in an undistributed ERISA-qualified plan. Nothing in *Boggs* suggests that uncommingled monies distributed from pension plans and placed in accounts not under the auspices of ERISA remain protected by it. In fact, federal courts have reached the opposite conclusion. *See, e.g., Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 39 F.3d 1078, 1081–82 (10th Cir.1994) (holding that "benefits" are protected under the ERISA anti-alienation provision only while they are within the fiduciary responsibility of the fund manager).

■ Alternatively, the Debtor argues that under Kansas law, he was entitled to claim the funds in the BFC account exempt. Pursuant to the Bankruptcy Code, a debtor in bankruptcy is entitled to exempt certain assets from the estate. Section 522 sets out the federal exemption scheme. 11 U.S.C. § 522. Under § 522(b), states are authorized to create their own exemptions and prohibit their citizens from choosing the federal exemptions. 11 U.S.C. § 522(b); *see David Dorsey Distrib. v. Sanders (In re Sanders)*, 39 F.3d 258, 260 (10th Cir.1994). Kansas has opted out of the federal exemption scheme provided in § 522(d) by enacting § 60–2312, which limits its citizens to the exemptions provided under state law. Kan. Stat. Ann. § 60–2312(a).[7]

---

7. This statute provides:
 Except as provided in subsection (b), no person as an individual debtor under the federal bankruptcy reform act of 1978 (11 U.S.C. § 101 et seq.), may elect exemptions pursuant to subsection (b)(1) of section 522 of such federal act.

The Debtor's argument focuses on two Kansas exemption statutes. He claims that under the language of either the BFC funds are exempt. When interpreting a statute, a court must first examine its language. *Dalton v. I.R.S.*, 77 F.3d 1297, 1299 (10th Cir.1996). The plain meaning of legislation should be conclusive, except in the " 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)). "If unambiguous statutory language is not defined, we give the language its common meaning, provided that the result is not absurd or contrary to the legislative purpose." *Dalton*, 77 F.3d at 1299. When interpreting Kansas statutes, Kansas case law is controlling. *Dunivent v. Bechtoldt (In re Bechtoldt)*, 210 B.R. 599, 601 (10th Cir. BAP 1997) (interpreting Wyoming exemption statute). Additionally, the interpretation of statutes must be informed by the policies that structured them. *Id.* at 601. Exemption statutes must be liberally construed so as to give effect to their beneficent purposes. *Id.*

First, the Debtor relies on Kan. Stat. Ann. § 60–2308, which delineates a debtor's exemption for retirement funds ("Kansas retirement exemption"). The Kansas retirement exemption[8] provides that "any money or other assets payable to a participant or beneficiary from, or any interest of any participant or beneficiary in a [qualified retirement plan] shall be exempt...." Kan. Stat. Ann. § 60–2308(b) (amended 2001). Section 60–2308(b) is in the disjunctive; it protects either money or assets payable from a qualified retirement plan or an interest of a participant or beneficiary in a qualified retirement plan. The Debtor does not dispute that the BFC account does not fit within the latter part of the statute as it is not a qualified retirement plan but an in-

---

Kan. Stat. Ann. § 60–2312(a). The Kansas statute provides an exception to the general opt out provision by permitting its citizens to claim an exemption under § 522(d)(10). Kan. Stat. Ann. § 60–2310(b). The Debtor makes a general assertion that perhaps he is entitled to exempt the BFC funds under this section, which gives a debtor the right to exempt funds that meet the following requirements:

> a payment under a stock bonus, pension, profit-sharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor....

11 U.S.C. § 522(d)(10)(E). However, the Debtor did not present the bankruptcy court with any factual evidence that the BFC were funds reasonably necessary for his support, so we will not consider this assertion here.

**8.** This statute has been amended. 2001 Kan. Sess. Laws 195. The amendment takes effect with respect to cases filed on and after July 1, 2001. This case commenced before July 1, 2001, so the original statute applies. It provides, in pertinent part:

> (b) Except as provided in subsection (c), any money or other assets payable to a participant or beneficiary from, or any interest of any participant or beneficiary in, a retirement plan which is qualified under sections 401(a), ... of the federal internal revenue code of 1986 and amendments thereto shall be exempt from any and all claims of creditors of the beneficiary or participant. Any such plan shall be conclusively presumed to be a spendthrift trust under these statutes and the common law of the state. All records of the debtor concerning such plan or arrangement and of the plan concerning the debtor's participation in the plan or arrangement shall be exempt from the subpoena process.

Kan. Stat. Ann. § 60–2308(b) (amended 2001).

vestment account. According to the Debtor, the BFC account is exempt pursuant to the initial part of the statute under the word "payable," which, he argues, includes monies that have been paid from an exempt fund. This is contrary to the interpretation given to that word in Kansas courts. In Kansas the term "payable" refers to funds that will be paid in the future, but it does not refer to funds already paid. *In re Moore*, 214 B.R. 628, 631 (Bankr.D.Kan.1997) (citing *State ex rel. Smith v. Shawnee County Comm'rs.*, 132 Kan. 233, 294 P. 915, 919 (1931) (holding that "[t]o give the word 'payable' any other or different meaning from the general equivalent of 'due,' or 'to be paid,' or 'capable of being paid,' would be giving it an unusual and strained construction.")).

Despite Kansas case law, the Debtor argues for a liberal interpretation of this statute based on the policy behind the exemption law. He supports this argument with an Illinois case, *Auto Owners Ins. v. Berkshire*, 225 Ill.App.3d 695, 167 Ill.Dec. 1100, 588 N.E.2d 1230 (1992). In *Berkshire* a judgment creditor petitioned for the turnover of funds held in a debtor's checking account. *Id.* at 1231. The funds were the proceeds of retirement benefits. *Id.* The Illinois appellate court held that exempt funds might retain their exempt status once they have been paid out to a beneficiary if the funds were a pension distribution intended for support. *Id.* at 1234. However, the court qualified this holding with the observation that "if the funds were a lump-sum distribution of the

defendant's interest in his pension plan [intended for future use and investment rather than support], the funds were no longer exempt because he failed to roll the funds over to another qualified plan." *Id.*

■ Alternatively, the Debtor argues that Kan. Stat. Ann. § 60–2310 ("Kansas wage garnishment statute") supports his position that the monies in the BFC account are earnings and, as earnings, are exempt. The Kansas wage garnishment statute restricts the amount that a creditor may garnish from an individual's earnings.[9] The Kansas wage garnishment statute was enacted so as to bring Kansas law into compliance with the federal Consumer Credit Protection Act, 15 U.S.C. § 1671 *et seq.* ("CCPA"). *See Coward v. Smith*, 6 Kan.App.2d 863, 636 P.2d 793, 796 (1981). In similar language, both the federal and the state statute permit creditors to garnish up to "twenty-five percent of the individual's aggregate disposable earnings for that workweek...." Kan. Stat. Ann. § 60–2310(b); 15 U.S.C. § 1673. Both the federal and the state statute define earnings as "compensation paid or payable for personal services, whether denominated as wages, salary, commission, bonus or otherwise." Kan. Stat. Ann. § 60–2310(a)(1); 15 U.S.C. § 1672(a). The Debtor argues that the funds in the BFC account are earnings because the funds fit into the "or otherwise" language of the earnings definition in § 60–2310(a)(1).

The language "or otherwise" modifies the phrase "compensation paid or payable

---

**9.** The Kansas wage garnishment statute provides in pertinent part:

> Subject to the provisions of subsection (e), only the aggregate disposable earnings of an individual may be subjected to wage garnishment. The maximum part of such earnings of any wage earning individual which may be subjected to wage garnishment for any workweek or multiple thereof may not exceed the lesser of: (1) Twenty-

> five percent of the individual's aggregate disposable earnings for that workweek or multiple thereof; (2) the amount by which the individual's aggregate disposable earnings for that workweek or multiple thereof exceed an amount equal to 30 times the federal minimum hourly wage, or equivalent multiple thereof for such longer period....

Kan. Stat. Ann. § 60–2310(b).

for personal services." In interpreting the Kansas wage garnishment statute, the Kansas supreme court found that there must be a direct link between the employee's compensation and the personal services. *Coward,* 636 P.2d at 796. In *Coward,* the court found that monies due an independent contractor for construction services were not within the "or otherwise" language of the earnings definition in the Kansas wage garnishment statute, reasoning that monies due an independent contractor are compensation for more than the services of the independent contractor, as those fees include compensation for "personal services performed by the contractor's employees, reimbursement for equipment used, and a return on capital." *Id.* As observed by the *Coward* court, the purpose behind the CCPA, and correspondingly, the Kansas wage garnishment statute, was to provide protection to that percentage of regular employee wages necessary for his or her support. *Id.*

The Debtor argues that the monies in the BFC account are monies given for personal services as they are derived from wages he received while an employee. Although no Kansas court has addressed the argument of whether funds that are derived from wages are earnings, we have focused on this issue in the context of interpreting both the CCPA and an identically worded state statute. *Trudeau v. Royal (In re Trudeau),* 237 B.R. 803 (10th Cir. BAP 1999) (holding that a tax refund is not included as earnings under the "or otherwise" language found in 15 U.S.C.

§ 1673 or Wyoming exemption law, Wyo. Stat. Ann. §§ 1–15–102 and 1–15–408(b)). In *Trudeau,* we supported our conclusion by noting that the Supreme Court found that the earnings definition in the CCPA refers only to " 'periodic payments of compensation needed to support the wage earner and his family on a week-to-week, month-to-month basis,' and '(do) not pertain to every asset that is traceable in some way to such compensation.' " *Trudeau,* 237 B.R. at 806 (quoting *Kokoszka v. Belford,* 417 U.S. 642, 651, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974)). Here, we find that the same reasons apply and that the "or otherwise" language in the Kansas wage garnishment statute is similarly restricted to periodic payments of compensation for personal services and may not be extended to every type of benefit or payment related to those wages.[10] To hold otherwise would be to protect virtually every asset a debtor funded with wages.

■■■■■ Debtor's final argument is that the bankruptcy court abused its discretion when it lifted the stay to allow the Appellee to pursue state court litigation. The filing of a bankruptcy petition under any chapter of the Bankruptcy Code initiates a broad automatic stay that prevents any attempts to enforce or collect prepetition claims or any actions that would affect property of the estate. 11 U.S.C. § 362(a). There are some circumstances, which are enumerated in § 362(b), when the stay does not apply. For example, the stay delineated in § 362(a) will not prohibit

---

**10.** Additionally, we note that it is unsettled in Kansas whether the Debtor could even claim an exemption on wages after they were placed in a checking account. *Compare In re Adcock,* 264 B.R. 708 (D.Kan.2000) (finding that under the wage garnishment exemption statute, a debtor could claim an exemption on wages only until they were deposited in a debtor's checking account, reasoning that after the wages were deposited they lost their character as earnings on the grounds that § 60–2310(b) protects only those wages held by the employer), *with In re Urban,* 262 B.R. 865, 870 (Bankr.D.Kan.2001) (disagreeing with *Adcock* and finding that Kan. Stat. Ann. § 60–2310 provides an exemption for wages that have been deposited in a checking account until they are untraceable or commingled).

"the collection of alimony, maintenance, or support from property that is not property of the estate." 11 U.S.C. § 362(b)(2)(B). If the creditor's proposed action does not fall within one of the exceptions, the creditor may move for relief from the stay under § 362(d). A bankruptcy court may terminate, annul, modify, or condition the stay when the creditor establishes one of the following:

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d). Here, the bankruptcy court modified the stay so that the Appellee could conclude her state court litigation.

Initially, the Debtor argues that the bankruptcy court abused its discretion because the Appellee did not meet the requirements of either prong of § 362. The Debtor argues that the Appellee did not show that there was lack of adequate protection of any interest in property or alternatively, that the Debtor had no equity in such property and the property was not necessary to an effective reorganization. The Debtor misreads § 362(d)(1). His reading eliminates "cause" as a separate discretionary basis on which the bankruptcy court may lift the stay. While cause under § 362(d)(1) includes "the lack of adequate protection" of an interested party in property, it is not so limited. 11 U.S.C. § 362(d)(1). Because "cause" is not further defined in the Bankruptcy Code, relief from stay for cause is a discretionary determination made on a case by case basis. *Pursifull v. Eakin*, 814 F.2d 1501,

1506 (10th Cir.1987). Many factors are relevant to the determination of whether to modify the stay to permit litigation to continue in another forum. *See In re Curtis*, 40 B.R. 795, 799–800 (Bankr.D.Utah 1984) (citing twelve nonexclusive factors). Courts have found that cause exists for lifting the stay for the purposes of judicial economy. *See, e.g., Piombo Corp. v. Castlerock Properties (In re Castlerock Properties)*, 781 F.2d 159, 163 (9th Cir.1986). Other relevant factors may include the impact of the stay on the parties and the degree to which the case has progressed in the other forum. *Curtis*, 40 B.R. at 800. In this case, under any of these factors, there was cause to modify the stay.

Alternatively, the Debtor contends that the bankruptcy court abused its discretion because in the absence of a determination that the Appellee's claim was "alimony, maintenance or support," and thereby exempt from the stay under § 362(b)(2)(B), the best place for determining the extent and dischargeability of the creditor's claim was the bankruptcy court. This argument is premised on the Debtor's conclusion that in the absence of a QDRO, the Appellee had no identifiable interest or in rem claim in the Hallmark Plans but only an in personam claim for debt. The Debtor argues that the bankruptcy court should have heard and determined the Appellee's claim because unless the claim was a nondischargeable debt under § 523, the claim would be discharged in bankruptcy.

The Appellee counters that although she does have an in personam claim against the Debtor that is nondischargeable under § 523 or is nondischargeable under § 727, she also has an ownership interest in the Hallmark Plans that never came into the estate and thus, never fell within the purview of the automatic stay. Additionally, she observes that she requested relief

from the stay for the sole purpose of obtaining a QDRO.

 A QDRO is a statutory exception to ERISA's strict prohibition against the alienation of pension plan funds. 29 U.S.C. § 1056(d)(3)(A). It is a domestic relations order that "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B). To qualify as a QDRO, a domestic relations order must meet specific requirements. *See id.* "The QDRO exception was enacted to protect the financial security of divorcees." *Gendreau v. Gendreau (In re Gendreau)*, 122 F.3d 815, 817 (9th Cir.1997) (citing *Ablamis v. Roper*, 937 F.2d 1450, 1453 (9th Cir.1991)). Neither party argues that the domestic relations order filed in 1982 qualifies as a QDRO.

 Debtor's principal argument is that in the absence of a QDRO, the Appellee does not have a claim against the pension plan, but may only proceed against the Debtor. There is some case law that supports the Debtor's theory. *See, e.g., King v. King (In re King)*, 214 B.R. 69 (Bankr.D.Conn.1997). In *King,* the court found that an ex-spouse's award of a 10% "share" in ERISA-qualified pension funds, which the court found would mature only when the funds became distributable at some point in the future, was a dischargeable debt in debtor's subsequent bankruptcy. *Id.* at 78. The bankruptcy court reasoned that ERISA's requirement for the filing of a valid QDRO, which had not been accomplished by the time debtor filed bankruptcy, pre-empted any conveyance made by the state divorce decree, which had not ordered payment to the former spouse directly from the pension fund. *Id.* at 79.

We do not agree with *King's* conclusions. First, we note that *King* is distinguishable; here, we have a matured right to payment, not a contingent obligation. Second, *King* is the minority view. Most courts tend to take a pragmatic view of the ERISA QDRO requirement by examining the divorce decree itself to determine if it contains the information provided by a valid QDRO. *See, e.g., Gendreau,* 122 F.3d at 818 (state court order intended to serve as QDRO); *Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080, 1085 (7th Cir.1994) (holding that a divorce decree fulfilled the requirements of a QDRO); *cf. Brown v. Pitzer (In re Brown),* 249 B.R. 303, 308 (S.D.Ind.2000) (holding that the language in a divorce decree effected a present transfer to ex-wife in non ERISA-qualified pension). These courts have found that even in the absence of a QDRO, a claimant has an identifiable interest in the pension plan that will not be discharged in bankruptcy. In fact, the exact argument the Debtor presented here was rejected by the Ninth Circuit in *Gendreau.*

In *Gendreau,* a Chapter 7 Debtor sought a declaratory judgment that the 50% interest in a pension plan awarded to his former wife in a divorce decree was a dischargeable debt. *Gendreau,* 122 F.3d at 817. The divorce decree at issue provided that it intended to be a QDRO and ordered the pension plan administrator to directly pay the wife her percentage of the pension plans. *Id.* Subsequently, the administrator of the pension plan determined that the payment order did not meet the requirements of a QDRO. *Id.* After the debtor filed a petition under Chapter 7, he argued that in the absence of a QDRO, his wife did not have a property interest in the pension plan, but merely a right to obtain a QDRO and payment, which, he argued, was by definition a dischargeable debt. *Id.* at 818. In affirming both the bank-

ruptcy court and the bankruptcy appellate panel's decisions, a unanimous Ninth Circuit found that the wife had an identifiable property interest in the pension plan.

First, the Ninth Circuit found that pursuant to the language of the divorce decree, if the plan failed to pay the wife, her recourse would be to sue the plan, not the debtor; therefore, the claim was an in rem claim. *Id.* Second, it found that a QDRO does not create an interest; it merely prevents a party from enforcing an interest until that party obtains a QDRO. The Ninth Circuit reasoned that it was the divorce decree that gave the wife a property interest in the plan that correspondingly limited the debtor's interest in the plan. Noting that a debtor could not obtain a greater interest in an asset by filing bankruptcy, the Ninth Circuit held that the wife did not have an unmatured debt owed by the debtor but a separate identifiable property interest in the plan. *Id.* at 818–19. Finally, the Ninth Circuit concluded that to permit a debtor to defeat a party's interest in a pension plan by filing bankruptcy at an opportune time would frustrate both ERISA and bankruptcy purposes.

We agree. We conclude not having a QDRO is not fatal to the Appellee's claim that she has an ownership interest in the Hallmark Plans. While the divorce decree here did not directly give the Appellee a right to proceed against the Hallmark Plans, it did give the Appellee an interest in the Hallmark Plans that correspondingly circumscribed the Debtor's interest. Therefore, the Appellee has a current property interest in the Hallmark plans that is separate from any claim she might have against the Debtor. Additionally, we observe that the Ninth Circuit's policy argument is also particularly persuasive here as it would be inequitable to permit the

Debtor to prevail under these circumstances because the Appellee was in the process of obtaining a valid QDRO when the state court proceedings were stayed due to the filing of the bankruptcy. Moreover, the relief from the stay in this case restricted the Appellee to obtaining a state court determination as to the amount of her prebankruptcy property rights in the Debtor's retirement accounts pursuant to their Separation Agreement.

## V. *Conclusion*

For the reasons set forth above, the bankruptcy court's judgment is AFFIRMED.[11]

---

11. We also DENY the Motion to Waive Oral

Argument filed November 15, 2001.