**In re Thelma E. ALLEN, Debtor.**

No. 03–0571.

United States Bankruptcy Court,
District of Columbia.

Sept. 5, 2003.

Charles R. Allen, Washington, DC, for Thelma E. Allen and Charles R. Allen.

L. Darren Goldberg, James E. Clarke, Draper & Goldberg, PLLC, Leesburg, VA, for Wells Fargo Bank Minnesota, N.A. as Trustee.

### DECISION REGARDING MOTION FOR RECONSIDERATION

S. MARTIN TEEL, JR., Bankruptcy Judge.

This decision addresses a motion for reconsideration filed by the debtor, Thelma E. Allen ("Mrs. Allen"), and her son, Charles R. Allen ("Mr. Allen"), regarding an order that annulled the automatic stay and the co-debtor stay that had arisen in this case under, respectively, § 362(a) and § 1301 of the Bankruptcy Code (11 U.S.C.). Specifically, the order annulled the stays with respect to a foreclosure sale of Mr. Allen's District of Columbia residence ("the Property") conducted by Wells Fargo Bank Minnesota, N.A. as Trustee ("Wells Fargo"). The court will deny the motion for reconsideration.

### I

### FACTS

The court annulled the stays because Mrs. Allen's filing constituted an abuse of the bankruptcy system, because Mrs. Allen would not have been allowed to address the debt at issue in her case had the foreclosure sale not been held, and because Wells Fargo proceeded with the foreclosure sale in ignorance of Mrs. Allen's case. The pertinent facts follow.

### A.

### MRS. ALLEN'S ASSERTED PRE-LOAN INTEREST IN THE PROPERTY

Beginning in 1986, Mr. Allen was the sole record owner of the Property located at 1854 5th Street, N.W., Washington, D.C., and he has maintained it as his residence. Mrs. Allen claims she had an ownership interest in the Property predating the mortgage of Wells Fargo. By affidavit, she recites that the Property is "being maintained as part of the family estate," and that she held a legal and equitable interest in the Property (a conclusory legal assertion, not a factual allegation sufficient to prove she indeed had such an interest). She also recites that she had an interest in an adjoining real property located at 1852 5th Street, N.W., Washington, D.C. that was also titled in her son's name. As a basis for asserting ownership, Mrs. Allen recites that:

> Between 1986 and 1999 I have provided substantial financial assistance (unsecured) to my co-owner Charles Allen, which was invested in the substantial renovation of the two aforementioned properties. I invested in the properties solely based on Charles Allen's verbal representations that the properties are located in a Historical [sic] section of Washington, D.C. and had great appreciation potential from which I will profit as well.

In addition, I expected to get a far greater return on my investment over the years via a substantial increase in equity from both properties which will be available to secure me during my retirement years. [The Property] was purchased in Charles Allen's name in 1986 for $64,500. The current market value as is, is approximately $500,000. Mrs. Allen's Affi. at p. 1.[1]

### B.

### THE NOTE AND DEED OF TRUST

In August 1999, Mr. Allen executed an interest-bearing promissory note (the "Note") held by Wells Fargo[2] that calls for equal monthly payments of $1,941.64 over a 30–year term and that is secured by the Property via a deed of trust (the "Deed of Trust"), a form of mortgage.[3]

The Wells Fargo debt, as noted, was incurred by Mr. Allen in August 1999, well after the majority of time that Mrs. Allen says she gave assistance towards renovations of the two properties. By remaining Mr. Allen's silent partner with respect to her and Mr. Allen's "family estate plan," and not insisting on receiving a deed reflecting her alleged interest, Mrs. Allen put her son in the position to make the covenants and warranties contained in the Deed of Trust, and to subject the Property to the consequences of any breaches of the Deed of Trust.

Two parts of that Deed of Trust are of particular importance here: the provision

---

1. Similarly, Mr. Allen recites that Mrs. Allen had an "unsecured and equitable interest" in the two properties, and that "[t]he subject properties and the substantial equity that they contain are part of a joint estate plan which will provide future economic security for both Charles R. Allen and Thelma Edith Allen." Mr. Allen's Affi. at p. 1.

2. The initial mortgagee was Option One Mortgage Corp. ("Option One"). Option One con-

tinues to handle the processing of mortgage payments. The court will use "Wells Fargo" to refer to both Wells Fargo and Option One as the change in mortgagee does not affect the outcome.

3. In the District of Columbia, a deed of trust is a form of mortgage (although not every mortgage is a deed of trust). *See Yasuna v. Miller*, 399 A.2d 68, 71–72 & n. 5 (D.C.1979).

for a covenant of seisin and a warranty of title, and the provision constituting a due-on-transfer clause.

### 1. The Covenant of Seisin and the Warranty of Title

Mr. Allen represented that he was the sole owner of the Property, for the Deed of Trust recited as Mr. Allen's opening covenant that:

> BORROWER COVENANTS that Borrower is **lawfully seised of the estate** hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. **Borrower warrants ... the title to the Property against all claims** and demands, subject to any encumbrances of record.

Deed of Trust at p. 2 (partial bolding of text added).[4]

#### a. Breaches of the Covenant of Seisin and the Warranty of Title

If, as the Allens now contend, Mrs. Allen indeed did have an ownership interest in the Property prior to Wells Fargo making the loan, that ownership interest would result in breaches of the covenant of seisin and of the warranty of title. Such breaches would have given rise to a right to accelerate:

4. The importance of the covenant of seisin and the warranty of title was reinforced by another provision reciting:
 > Borrower shall, at Borrower's own expense, appear in and defend any action or proceeding purporting to affect the Property or any portion thereof or Borrower's title thereto .. or the rights or powers of Lender or Trustee with respect to this Security Instrument or the Property.
 Deed of Trust at ¶ 6.

5. This finding is reinforced by an additional condition to reinstatement, namely, that the borrower:
 > **takes such action as Lender may reasonably require to assure that the lien of this Secu-**

> 21. **Acceleration; Remedies. If ... Borrower should be in default under any provision of this Security Instrument ... all sums secured by this Security Instrument ... shall at once become due and payable at the option of Lender without prior notice, except as otherwise required by applicable law ....**

Deed of Trust ¶ 21 (bold lettering in original). Upon Wells Fargo deciding to treat the debt as accelerated on the basis of such defaults, that would have provided a basis for invoking the remedy of foreclosure. *Id.*

As a condition to reinstatement after acceleration, the Allens would have had to cure the defaults. Deed of Trust ¶ 18. However, to cure the defaults would have required that Mr. Allen acquire sole title to the Property, that is, that Mrs. Allen be divested of any title. Divesting Mrs. Allen of an ownership interest would preclude her using a bankruptcy case as a vehicle for addressing the Wells Fargo debt as she is not personally liable for the debt.[5]

#### b. Misrepresentations in Signing the Covenant of Seisin and the Warranty of Title

In signing the covenant of seisin and the warranty of title, Mr. Allen represented

> **rity Instrument, Lender's rights in the Property[,] and Borrower's obligation to pay the sums secured by this Security Instrument shah [sic] continue unchanged.**
Deed of Trust ¶ 18 (emphasis added). Under the terms of the Deed of Trust, Wells Fargo was faced with Mr. Allen as a single borrower and owner of the Property. Mr. Allen was barred from filing a bankruptcy case. Wells Fargo's rights in the Property (assuming Mr. Allen had been truthful in warranting his title) thus included the right to proceed to foreclosure against the Property without a bankruptcy case being filed by an undisclosed pre-mortgage owner to stop foreclosure.

that he alone owned the Property. If, as the Allens now contend, Mrs. Allen indeed had an ownership interest in the Property when Wells Fargo made the loan to Mr. Allen, those representations were material misrepresentations. This would make relevant another provision of the Deed of Trust:

**24. Misrepresentation and Nondisclosure.** Borrower has made certain written representations and disclosures in order to induce Lender to make the loan evidenced by the Note ... which this Security Instrument secures, and in the event that Borrower has made any material misrepresentation or failed to disclose any material fact, Lender, at its option and without prior notice or demand, shall have the right to declare the indebtedness secured by this Security Instrument ... immediately due and payable....

Deed of Trust at ¶ 24 (bold lettering in original).[6] In turn, Deed of Trust ¶ 18 required as a condition to reinstatement after acceleration that the borrower pay amounts that were due (except via acceleration) under the Note or the Deed of Trust and "cure[ ] any default of any other covenants or agreements". Although a breach of the Deed of Trust's obligations, for example, to keep insurance in place and timely to pay real estate taxes might be susceptible of cure, a material misrepresentation arguably cannot be cured: once made, it remains a material misrepresentation.

Assume, however, without conceding the point, that a misrepresentation ceases to exist if the fact misrepresented ceases to exist. Even if such an assumption were

valid, any ownership of Mrs. Allen would have to cease to exist in order for the misrepresentation to cease existing. Again, a lack of ownership would preclude her using a bankruptcy case as a vehicle for addressing the Wells Fargo debt.

2. *The Due–on–Transfer Clause*

The Deed of Trust also contained a due-on-transfer clause. Mr. Allen agreed that:

**17. Transfer of the Property** .... If all or any part of the Property or any interest in it is sold or transferred ... without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Deed of Trust at ¶ 17 (bold lettering in original).

The due-on-transfer clause was singled out for special mention in the Note. After mentioning the existence of the Deed of Trust, and reciting that it described how and under what conditions Mr. Allen might be required to make immediate payment of

---

6. Similarly, the deed of trust provided:
 ... Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed

to provide Lender with any material information) in connection with the loan evidenced by the Note ...
Deed of Trust at ¶ 6.

the Note obligation, the Note recited that "[s]ome of those conditions are described as follows":

> **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any of the Property or any interest in it is sold or transferred ... without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. *Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of breach of any covenant or agreement in this Security Instrument is acceptable to Lender.*
>
> *To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.*

Note at ¶ 10 (bold lettering in original; italicized language added).

Although the italicized language did not appear in the Deed of Trust, thus raising a question of whether the Note thereby amended the Deed of Trust, what is important for purposes of this case is that this language reinforced that under the Deed

of Trust, Wells Fargo was not required to consent to a transfer if Mr. Allen's obligations under the Note or Deed of Trust were already in default and those defaults had not been cured. The italicized language additionally made evident that the parties regarded any consent by Wells Fargo to a transfer as requiring advance notice to Wells Fargo with adequate time for it to evaluate the risks that the transferee might pose of breaching the obligations under the Note and the Deed of Trust.

As will be seen, the payment obligations under the Note had already been breached many months before Mrs. Allen's case commenced, and remained in breach, and the Allens were not prepared to cure the defaults prior to the commencement of her case. So under no circumstances were the Allens entitled to believe that a transfer to Mrs. Allen would meet the criteria Wells Fargo was entitled to apply to the issue of whether to consent to a transfer.

Deed of Trust ¶ 18 provided that the borrower's right to reinstate "shall not apply in the case of acceleration under paragraph 717[sic]," obviously meaning paragraph 17,[7] the due-on-transfer clause which, independent of the general provision in paragraph 21 for acceleration based on defaults, provides for acceleration based on an unconsented—to transfer. As will be seen, Mr. Allen executed a deed only days before this bankruptcy case conveying a 50% interest in the Property to Mrs. Allen. That triggered the due-on-transfer clause, giving rise to a right of acceleration that, under the Deed of Trust, was expressly barred from de-acceleration.

Even if de-acceleration were not barred, de-acceleration would have required that the breach be cured, that is, that the

7. Similarly, Deed of Trust ¶ 19 recites that "Borrower will be given written notice of the change in accordance with paragraph **714** above" (emphasis added) when Deed of Trust ¶ 14 (entitled **"Notices"** (emphasis in original)), is the paragraph dealing with notices.

transfer be set aside, but setting aside the transfer would mean that Mrs. Allen would no longer have an interest in the Property based on the post-loan transfer. Without an ownership interest, she would have no way to address the mortgage monetary defaults through a chapter 13 plan.

## C.

### MR. ALLEN'S FAILED BANKRUPTCY CASE AND ITS DISMISSAL WITH PREJUDICE FOR 180 DAYS

On February 27, 2002, Mr. Allen commenced in this court a case under chapter 13 of the Bankruptcy Code, Case No. 02–00421.[8] Even though the Schedule A he filed called upon him to disclose any ownership by him of less than the entire Property, Mr. Allen did not disclose that his mother owned any interest in the Property.[9] When he commenced his case, Mr. Allen was more than 13 months behind in monthly mortgage payments, owed a total arrearage (including fees and charges) of $26,194.20, and a total mortgage debt of $212,494.25 (over $4,000 more than the original Note balance of $208,0000).

8. The court's recitations regarding Mr. Allen's case are taken from facts established by the papers filed in that case, including the trustee's Final Report and Account.

9. Mr. Allen's Schedule A listed the Property as real property owned by him and indicated that the nature of his interest in the Property was "Fee Owner" and did not check the column that would have indicated that there was any other joint owner of the Property. He listed the Property as worth $325,000.00 and his interest as worth $325,000, subject to a lien of $207,584.34.

10. *See* Consent Order Modifying Automatic Stay entered on November 5, 2002. The Consent Order required Mr. Allen to cure post-petition arrears by making six payments of $1,581.48 on the 15th of each month commencing November 15, 2002. As of the dismissal in January, three cure payments totaling $4,744.44—those that were to be paid in

Based on Mr. Allen having only made one plan payment in the case, the court dismissed Mr. Allen's case with prejudice for 180 days by an order entered on January 23, 2003. Wells Fargo received a payment from the chapter 13 trustee of $1,440.00 as its only distribution under the plan towards payment of the prepetition arrears. Despite that payment, at the time of dismissal Mr. Allen was further behind in missed monthly payments than at the commencement of the case by at least $3,304.44 because he failed to remain current on monthly payments that came due after the petition date.[10] Further, Wells Fargo had been delayed in exercising its nonbankruptcy law remedies for just shy of 11 months.[11]

## D.

### MR. ALLEN'S FAILURE TO SELL THE PROPERTY DESPITE WELLS FARGO'S RENEWED FORECLOSURE SALE EFFORTS

With the shelter of the automatic stay in his bankruptcy case, which was pending

February, March, and April 2003—were not yet due. Reduced by the $1,440.00 payment Wells Fargo received from the trustee, that means Mr. Allen was behind by at least the net amount of $3,304.44.

The amount was higher if Mr. Allen failed additionally to make any of the cure payments that had already come due or failed to make the regular monthly mortgage payment of $1,941.64 for November, December, or January. However, the record does not shed light on that.

11. Despite the delay of now more than a year, Mr. Allen is still not required to pay any interest on the interest component of his prepetition arrears, as neither the Note nor the Bankruptcy Code provide for such. *See* 11 U.S.C. § 1322(e) (excepting cures of defaults under a chapter 13 plan from the operation of 11 U.S.C. § 1325(a)(5)(B)(ii)). However, Wells Fargo did not bargain on the delay it has encountered.

for almost 11 months, Mr. Allen could have proceeded to sell the Property (or the adjoining property, whose sale could have raised funds to address his defaults on the Wells Fargo mortgage). He waited until December 20, 2002, thirty-four days before the dismissal of his case, to list the Property and the adjoining property for sale.

After Mr. Allen's case was dismissed, Wells Fargo gave notice that it would conduct a foreclosure sale of the Property on March 27, 2003, thereby giving Mr. Allen more than an additional two months after dismissal of his case within which to achieve a sale of the Property in order to realize any equity (or to sell the adjoining property to raise funds to bring the Wells Fargo mortgage current). Although Mr. Allen received offers for the two properties, he did not consider them "favorable offers" and he attributes the lack of favorable offers to the many snow storms that occurred after he listed the properties for sale and before the foreclosure sale date of March 27, 2003. Instead of selling the Property pursuant to such offers, Mr. Allen subjected the Property to the risk of a foreclosure sale that might command less than had been offered.

### E.

### THE DEED TO MRS. ALLEN, HER BANKRUPTCY CASE, AND WELLS FARGO'S FORECLOSURE SALE TO A THIRD PARTY

On March 21, 2003, just six days prior to the scheduled foreclosure sale, Mr. Allen executed a deed conveying the Property to himself and his mother as tenants in common, each owning a 50% interest. Mr. Allen recorded that deed on March 24, 2003, with the Recorder of Deeds. On March 24, 2003 at 4:05 p.m., Mr. Allen filed his mother's petition commencing this bankruptcy case under chapter 13 of the Bankruptcy Code.

Mrs. Allen never filed schedules, a statement of financial affairs, or a chapter 13 plan, and instead, on May 16, 2003 (56 days after commencing the case) sought dismissal without prejudice on the grounds that she was 78 years old, living on a fixed income, and needed but was unable to secure the assistance of a bankruptcy attorney in filing the required papers. The court dismissed the case without prejudice by an order entered on May 27, 2003.

In the meanwhile, unaware of Mrs. Allen's having acquired a 50% interest in the Property and of her having commenced a bankruptcy case, Wells Fargo had taken no steps to halt the foreclosure sale. (The basis for the court's finding that Wells Fargo lacked knowledge is discussed at length in part VII of this decision.) The trustees under the Deed of Trust proceeded to conduct a nonjudicial foreclosure sale, in accordance with District of Columbia law, on March 27, 2003. A third party, Case Capitol Corporation, purchased the Property at the auction sale for, Mr. Allen understands, $226,000, a price that he contends is far less than the current market value of the Property.

### F.

### MRS. ALLEN'S PURPOSE IN PURSUING THE BANKRUPTCY CASE

Mrs. Allen's affidavit recites that:

my decision to seek Chapter 13 protection was specifically intended to save the subject real properties [the Property that was Wells Fargo's collateral as well as 1852 5th Street] and to preserve my legal and equitable interest in the properties pending the sale of one or both of the properties so as to cure the Mortgage default with [Wells Fargo].

The second property (1852 5th Street) was later sold for $372,000. The Allens' affida-

vits in evidence do not claim that the $372,000 sale generated sufficient net proceeds to allow them to pay off the Wells Fargo mortgage, or even to cure fully the monetary default on the Wells Fargo mortgage.

## II

## THE ACADEMIC ISSUE OF WHETHER MRS. ALLEN HAD AN OWNERSHIP INTEREST

There is an obvious conflict between Mr. Allen's Schedule A in his own bankruptcy case (not listing Mrs. Allen as having any interest in the Property) and the statements in the Allens' affidavits in this case (which they assert establish that Mrs. Allen had an equitable ownership interest preceding the Wells Fargo loan). The court thus declines to credit the Allens' affidavits' conclusory recitations that Mrs. Allen had an ownership interest in the Property pre-dating the Wells Fargo loan, but even if she had such an interest, it will not alter the outcome.

The Allens say that Mr. Allen held the Property (as well as the second real property) as part of a family estate plan, and that Mrs. Allen looked to her advancing of funds for the renovation of the Property as an investment in the Property. The Allens' arrangement, if their affidavits are to be believed, created only an informal arrangement whereby the Allens would use the Property to meet each of the Allens' future needs. Mrs. Allen never needed to enforce that arrangement against Mr. Al-

len, and she left Mr. Allen as the owner of the Property.

■ While her right to enforce the arrangement might eventually have given rise to a court of equity's imposing a constructive trust on the Property had Mr. Allen not devoted it to the intended purposes, Mr. Allen was never in breach of the arrangement, and so a constructive trust could not have been imposed.[12] And an equitable lien imposed in favor of Mrs. Allen would not have given rise to any stay against Wells Fargo in her case.[13] Mr. Allen never attempted unjustly to enrich himself as against Mrs. Allen, and Wells Fargo never attempted unjustly to enrich itself against Mrs. Allen (of whom it was kept in the dark), so the elements for imposing an equitable interest in favor of Mrs. Allen in the Property are lacking.

■ Even if Mrs. Allen actually had an equitable ownership interest in the Property based on the arrangement recited in the Allens' affidavits, she subjected that interest to the superior rights of Wells Fargo. *See Osin v. Johnson,* 243 F.2d 653, 657 (D.C.Cir.1957) ("a bona fide purchaser's rights [including those of the holder of a deed of trust] have always been held superior to prior equitable interests" even without a recording statute); *Associates Fin. Servs. of Am. v. District of Columbia,* 689 A.2d 1217 (D.C.1997); D.C.Code Ann. § 42–401 (recording statute). As discussed below, the court declines to engage in the inequitable act of giving effect to any such interest that was not disclosed to Wells Fargo when it made the loan.

---

12. *See Hertz v. Klavan,* 374 A.2d 871, 873 (D.C.1977) ("[a] constructive trust is a flexible remedial device used to force restitution in order to prevent unjust enrichment."). *See also Gallimore v. Washington,* 666 A.2d 1200, 1210 n. 13 (D.C.1995); *Gore v. Gore,* 638 A.2d 672, 675–76 (D.C.1994); *Gray v. Gray,* 412 A.2d 1208, 1210 (D.C.1980); *Osin v. Johnson,* 243 F.2d 653, 656 (D.C.Cir.1957).

13. Such a lien would not constitute an ownership interest in the Property. *See First Fed. Bank of Cal. v. Cogar (In re Cogar),* 210 B.R. 803, 812 (9th Cir. BAP 1997) (the debtor's "lien interest in the property was property of the estate, however the property itself was not property of the estate.").

## III

## HAD THE FORECLOSURE SALE NOT BEEN HELD, WELLS FARGO WOULD HAVE BEEN ENTITLED TO RELIEF FROM THE STAYS

Relief from the stays would have been granted had Wells Fargo sought such relief prior to proceeding with foreclosure.

### A.

## THE ALLENS' INEQUITABLE CONDUCT AND THE ANTI–MODIFICATION PROVISIONS OF 11 U.S.C. § 1322(b)(2) WOULD HAVE WARRANTED SUCH RELIEF

■ The Allens sought to stop a foreclosure sale (for monetary defaults under the Note that Mr. Allen was no longer free to address via a bankruptcy case) through the expedient of Mrs. Allen filing a bankruptcy case and asserting (1) an equitable ownership interest not of record (whose nondisclosure constituted a breach by Mr. Allen of the covenant of seisin and the warranty of title, and a material misrepresentation that under the Deed of Trust warranted acceleration of the mortgage debt) and (2) a record ownership interest (based on a transfer to Mrs. Allen that itself constitutes a nonmonetary ground for accelerating the mortgage debt). That is inequitable conduct that ought not be tolerated.

Mrs. Allen placed herself in the position of being on record notice of the Deed of Trust's provisions. Whatever rights she had against Mr. Allen regarding the Property were subject to foreclosure based on the mortgagee's acceleration of the mortgage debt pursuant to those provisions.

Wells Fargo justifiably expected that it would not be saddled with a new owner of its collateral who could extend Mr. Allen's time to cure his mortgage monetary defaults via filing her own chapter 13 case. Wells Fargo chose to dance with only Mr. Allen in the mortgage relationship. Mrs. Allen may have been Mr. Allen's silent partner in investing in the renovation of the Property, but that did not make her Wells Fargo's dance partner.

The Allens' stratagem was an expedient that was designed to buy time to address monetary defaults that Mr. Allen himself could not address via a new bankruptcy case. The stratagem depended on an ownership interest that itself constituted a default warranting acceleration of the debt, a default that could not be cured via a cure of monetary defaults. The Bankruptcy Code is not intended to permit that type of improper stratagem: the owner of the Property had his opportunity to cure the monetary arrears, and the Bankruptcy Code is not intended to permit a previously undisclosed owner to invoke cure rights that the sole mortgagor and owner of record already was barred from employing. Accordingly, had Wells Fargo known of Mrs. Allen's bankruptcy case and sought relief from the automatic stay and the codebtor stay to proceed with the foreclosure sale, the court would have granted such relief.[14]

■ There would have been another ready ground for lifting the stays: the bar of 11 U.S.C. § 1322(b)(2) against modification of home mortgages, in combination with the default based on the due-on-transfer clause, would have prevented Mrs. Allen from obtaining confirmation of a plan that attempted to leave her with an ownership interest in the Property with a right

**14.** Relief from the codebtor stay would have been required additionally under 11 U.S.C. § 1301(c)(1) as Mr. Allen, not Mrs. Allen, received the consideration for the claim held by Wells Fargo, and also under 11 U.S.C. § 1301(c)(3) as Mrs. Allen never filed a plan.

to cure the monetary mortgage defaults. (Decisions to the contrary are distinguishable and erroneously decided as discussed in the next part of this decision.)

However, the anti-modification provision of 11 U.S.C. § 1322(b)(2) applies only to a security interest (including mortgages) encumbering the debtor's principal residence. The record suggests that the Property may not be Mrs. Allen's principal residence, although it is Mr. Allen's principal residence.

Allowing the Allens to escape the strictures of § 1322(b)(2), which saddled Mr. Allen in his own case, through the stratagem of transferring partial title to Mrs. Allen (in violation of the due-on-transfer clause), and having her file a bankruptcy case, in which § 1322(b)(2) would not apply to her, would be an abuse of the bankruptcy system. That would be the equivalent of a court's extending mercy to an orphan who acquired such status by killing his parents.[15] Congress obviously did not intend § 1322(b)(2) to be readily circumvented through a conveyance of a fractional interest to a third-party not residing in the encumbered home.

Moreover, even disregarding the strictures of § 1322(b)(2) that Mr. Allen faced, Mr. Allen's prohibited transfer of a recorded interest to Mrs. Allen was intended to circumvent the bar against his re-filing a bankruptcy case. In those circumstances, a plan by Mrs. Allen proposing to retain ownership pursuant to a **prepetition** transfer in violation of the due-on-transfer clause could not have met the good faith requirement of 11 U.S.C. § 1325(a)(3) to confirmation. Modification of a due-on-transfer clause has been held to be permissible in a corporate chapter 11 case to permit a **postconfirmation** change in ownership to be made under a plan in order to facilitate maximization of the estate.[16] No reported decision has ever permitted **modification** of a mortgage via confirmation of a plan blessing a **prepetition** transfer to the debtor that violated a due-on-transfer clause when bad faith was present.[17]

**15.** That irony is heightened by the lender's having intended to deal only with a mortgagor that would occupy the property as his or her residence, with acceleration and foreclosure a remedy for breach of the covenant in that regard. *See* Deed of Trust ¶ 6. Mrs. Allen would claim the right to disregard the anti-modification provisions of § 1322(b)(2) based on the Property not being her principal residence while at the same time contending that she may deal with the mortgage debt as though it were her own but without the mortgagee having a right to foreclose based on her not occupying the Property. If, as would ordinarily be a requisite to the mortgagee's consenting to a transfer, Mrs. Allen had assumed the debt, then as a mortgagor, Deed of Trust ¶ 6 would be enforceable against her.

**16.** In *In re Coastal Equities, Inc.,* 33 B.R. 898, 902, 905–906 (Bankr.S.D.Cal.1983), the court upheld a plan to permit postconfirmation transfers to solvent purchasers as a permissible modification that met § 1129(b) standards of being "fair and equitable." The issue was not, as here, that of a prepetition transfer to

the debtor in violation of a due-on-transfer clause. *But see IPC Atlanta Ltd. P'ship v. Fed. Home Loan Mortgage Corp. (In re IPC Atlanta Ltd. P'ship),* 163 B.R. 396, 401 (Bankr. N.D.Ga.1994) (requiring that loan documents modified under a plan include a due-on-transfer clause).

**17.** *In re Real Pro Financial Services, Inc.,* 120 B.R. 216 (Bankr.M.D.Fla.1990), involved a prepetition transfer, in violation of a due-on-transfer clause, to a corporate debtor that then commenced a chapter 11 case. The court denied stay relief because the issue of modification was better left to a plan confirmation hearing. The court did not address whether confirmation of a plan containing such a modification blessing the prepetition transfer would be "fair and equitable" under 11 U.S.C. § 1129(b) and meet the "good faith" test of 11 U.S.C. § 1129(a)(3). Moreover, the court distinguished the case from *In re Green,* 42 B.R. 308 (Bankr.D.N.H.1984), a chapter 13 case remarkably like Mrs. Allen's. *See also* Collier on Bankruptcy ¶ 1322.07[2] at

## B.

## DECISIONS THAT NEGATE DUE–ON–TRANSFER CLAUSES IN HOME MORTGAGES ARE DISTINGUISHABLE AND IN ANY EVENT ERRONEOUSLY DECIDED

Some bankruptcy courts have held after *Johnson v. Home State Bank*, 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), that an entity that purchases property in violation of a mortgage's due-on-transfer clause may nevertheless cure and reinstate that mortgage in a chapter 13 bankruptcy case despite continuing to retain ownership.[18] Other bankruptcy courts have held to the contrary, reasoning that the new owner's continued retention of the property would work a modification of the mortgage in violation of 11 U.S.C. § 1322(b)(2)[19] and

this court views those decisions as reaching the correct result.[20]

1. *The Decisions Nullifying Due–on–Transfer Clauses Are Distinguishable.*

This case is distinguishable from those decisions holding that a purchase of mortgaged realty in violation of a due-on-transfer clause may be kept in place through the purchaser's case under chapter 13 of the Bankruptcy Code. None of those decisions involved a last-minute transferee filing bankruptcy to stop foreclosure after the original mortgagor already had unsuccessfully attempted to utilize chapter 13 to save his home. In those cases, the mortgagees either did not argue the existence of bad faith, or the court expressly found no bad faith existed.[21]

1322–26 (15th ed. revised 2001) (suggesting that a default based on the exercise of a due-on-transfer clause could be waived in a plan pursuant to 11 U.S.C. § 1322(b)(3), but failing to address issues of good faith).

**18.** *See In re Garcia*, 276 B.R. 627 (Bankr. D.Ariz.2002); *In re Trapp*, 260 B.R. 267 (Bankr.D.S.C.2001); *In re Rutledge*, 208 B.R. 624 (Bankr.E.D.N.Y.1997); *In re Allston*, 206 B.R. 297 (Bankr.E.D.N.Y.1997). These decisions have been discussed with disapproval in Arthur J. Margulies, *The Cure and Reinstatement of Mortgages by Third Party Assignees*, 24 Cardozo L.Rev. 449 (2002) (*"Cure and Reinstatement"*), and Lawrence Simons, *The Chapter 13 Plan: A Cure–All for the Debtor Who is Not Obligated on a Secured Debt?*, 2002 No. 12 Norton Bankr.L. Adviser 2 (available on Westlaw as 2002 No. 12 NRTN–BLA 2).

**19.** *See In re Parks*, 227 B.R. 20 (Bankr. W.D.N.Y.1998); *In re Kizelnik*, 190 B.R. 171 (Bankr.S.D.N.Y.1995); *In re Martin*, 176 B.R. 675 (Bankr.D.Conn.1995); *In re Threats*, 159 B.R. 241 (Bankr.N.D.Ill.1993).

The court, however, does not necessarily agree with another ground of decision in some of those cases, a ground relied upon in *In re Mitchell*, 184 B.R. 757 (Bankr.C.D.Ill. 1994), and in various decisions pre-dating *Johnson*, namely, that there must be privity in

order to allow a debtor to address mortgage defaults. If a daughter inherits a home (a transfer excepted by 12 U.S.C. § 1701j–3(d)(6) from being a ground for accelerating the mortgage) is she to be precluded by "lack of privity" from using chapter 13 to save the house from foreclosure when she defaults in making mortgage payments?

**20.** There additionally are decisions which permitted cure and reinstatement after a transfer that are distinguishable from Mrs. Allen's case because the transfer in each case, as a matter of nonbankruptcy law, did not constitute a basis for acceleration, and there was no prior failed bankruptcy case by the original owner. *See In re Lippolis*, 216 B.R. 378 (Bankr.E.D.Pa.1997), *rev'd*, 228 B.R. 106 (E.D.Pa.1998); *In re Wilcox*, 209 B.R. 181 (Bankr.E.D.N.Y.1996); *In re Hutcherson*, 186 B.R. 546 (Bankr.N.D.Ga.1995); *In re Lumpkin*, 144 B.R. 240 (Bankr.D.Conn.1992). The mortgagee in each case is barred by 12 U.S.C. § 1701j–3(d)(5) or (6) from accelerating the mortgage debt based on the transfer as the transfer was to a relative resulting from the death of the mortgagor or was to the mortgagor's child.

**21.** In *Trapp*, 260 B.R. at 269, the court found that:

There is no evidence ... that Debtor knew about the due-on-sale clause in the Mort-

2. *The Decisions Nullifying Due–
 on–Transfer Clauses Were
 Erroneously Decided.*

■ Moreover, the court rejects the premise of those decisions. They assume, most of them *sub silentio,* that a "cure" under § 1322(b)(5) can be made of a violation of a due-on-transfer clause without setting aside the transfer. However, "cure" means restoring the parties to the position they would occupy but for the default. *See In re Clark,* 738 F.2d 869, 872 (7th Cir.1984) (" '[C]ure' ... refers to ... the restoration of the way things were before the default. Thus, the plain meaning of 'cure,' as used in § 1322(b)(2) and (5), is to remedy or rectify the default and restore matters to the *status quo ante.*"); *DiPierro v. Taddeo,* 685 F.2d 24, 26–27 (2d Cir.1982) ("Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified.").[22]

The *Garcia* decision, 276 B.R. at 635–36, at least expressly addresses the issue of cure versus modification, but erroneously reasons that allowing a transfer that violated a due-on-transfer clause to remain in place does not constitute a modification because it does not alter the mortgagee's future rights. However, due-on-transfer clauses restrict the owner with whom the mortgagee must deal. The mortgage here in essence provided that Mr. Allen would remain the owner unless Wells Fargo consented to a transfer upon the mortgage having been brought current. That right is destroyed if the court allows the debtor's plan to force a new owner on the mortgagee in continued violation of the due-on-transfer clause. The egregiousness of such a destruction is particularly obvious when, as here, the due-on-transfer clause contemplates that the mortgagee will be well within its rights to refuse to consent to a transfer if mortgage payments are, as here, in arrears at the time of the proposed consent, or if the proposed new owner is not creditworthy.

Although the transfer, as a default constituting a past event, may be addressed under § 1322(b)(5) by way of cure, anything short of restoring ownership to the original owner is not a cure, as it does not restore the *status quo ante.* Instead, it works a modification of the mortgagee's future right to deal only with the original mortgagor as owner of its collateral, and to consent to a transfer only if the mortgage payments are current and the proposed transferee otherwise meets with the mortgagee's approval.[23]

---

gage or contemplated bankruptcy when she acquired ownership of the property, which might indicate lack of good faith on her part.
Similarly, in *Garcia,* 276 B.R. at 629, there was no "allegation that the Debtors acted in bad faith either in acquiring the property or in filing this Chapter 13 case." In *Rutledge,* 208 B.R. at 624, and *Allston,* 206 B.R. at 299, the mortgagees apparently did not contend that the filing, based on the existence of the due-on-transfer clause, constituted bad faith.

**22.** *See also Litton v. Wachovia Bank,* 330 F.3d 636, 645 (4th Cir.2003); *Great Western Bank & Trust v. Entz–White Lumber and Supply, Inc. (In re Entz–White Lumber and Supply, Inc.),* 850 F.2d 1338, 1340 (9th Cir.1988);

*Appeal of Capps,* 836 F.2d 773, 777 (3d Cir. 1987) ("Cure by its very nature assumes a regime where debtors reinstate defaulted debt contracts in accordance with the conditions of their contracts."); *Grubbs v. Houston First Am. Sav. Ass'n,* 730 F.2d 236, 241 (5th Cir. 1984) (en banc); *Threats,* 159 B.R. at 243.

**23.** Accordingly, the court need not decide whether a "cure" is a subset of "modifications," *see Rake v. Wade,* 508 U.S. 464, 473 n. 9, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993), or, instead, a distinct concept, *see Garcia,* 276 B.R. at 633–36. The issue is academic because a plan that provides for the transfer to remain in place without restoration of title to the original owner does not cure the default

■ As observed in *Litton*, 330 F.3d at 644, a modification is a plan provision that alters fundamental aspects of the creditor's rights. Section 1322(b)(2) focuses on the lender's rights, not just its claim, and those rights are set by the relevant mortgage instruments and applicable nonbankruptcy law. *Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 328–29, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). That due-on-transfer clauses constitute a fundamental aspect of a mortgagee's rights under a mortgage was made clear by *Fidelity Federal Savings Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), which held that a Federal Home Loan Bank Board ("FHLLB") regulation preempted state court limitations on the enforceability of due-on-transfer clauses in mortgages held by federal savings and loan institutions. The Court recited the FHLBB's determination that such clauses enable lenders to replace long-term, low-yield loans with loans at the prevailing interest rate upon transfer, and state court decisions restricting the enforceability of such clauses "lengthen the expected maturity date of a lender's mortgages, thus reducing their marketability in the secondary mortgage market." *de la Cuesta*, 458 U.S. at 168–69, 102 S.Ct. 3014. Congress then extended similar status to due-on-transfer clauses in almost all mortgages, both federal and non-federal, by the passage of the Garn–St. Germain Depository Institutions Act of 1982.[24] *See Cure and Reinstatement*, 24 Cardozo L.Rev. at 496 n. 70. As relevant here, § 341 of the Act enacted 12 U.S.C. § 1701j–3 ("Preemption of due-on-sale prohibitions"), which generally prohibits state law from restricting the

enforcement of due-on-transfer clauses. None of the statute's restrictions on the enforceability of due-on-transfer clauses are applicable to the transfer to Mrs. Allen. *See* 12 U.S.C. § 1701j–3(d); 12 C.F.R. § 591.5.

Although the regulation in *de la Cuesta*, that in turn prompted the enactment of 12 U.S.C. § 1701j–3, addressed due-on-transfer clauses' effects on the lender's ability to command a higher interest rate on transfer and the impact on the expected maturity date of mortgages, it is obvious that such clauses are also intended to enable the mortgagee to decline to deal with a proposed new owner when the proposed new owner is not creditworthy[25] or when the mortgage payments are not current.

That Congress so intended is made evident by the case of certain loans to veterans, that by statute enjoy favorable provisions regarding assumption by a purchaser from the veteran. Conditions of such assumption include the loan being current (*see* 38 U.S.C. § 3714(a)(1)(A)) and the creditworthiness of the purchaser (*see* 38 U.S.C. § 3714(a)(1)(B)(ii)).

Accordingly, due-on-transfer clauses are a fundamental aspect of a mortgagee's rights, and permitting the circumvention of such clauses under a chapter 13 plan works an impermissible modification of those rights. *See Threats*, 159 B.R. at 243. A cure would require restoring full title in the mortgagor, and such a cure would be useless (as the automatic stay would not apply to a debtor without title to the mortgaged property or personal liability on the debt). *See Threats*, 159 B.R. at 243;

arising from violation of the due-on-transfer clause.

**24.** Pub.L. 97–320, 96 Stat. 1505.

**25.** *See Kizelnik*, 190 B.R. at 176 ("[L]ender is understandably and properly concerned with

the creditworthiness, reliability and integrity of its prospective borrower ... [and] has the right to lend only to person it believes will honor all obligations under the loan documents.").

*Parks,* 227 B.R. at 24. Just as the Bankruptcy Code contains no provision permitting imposition on a mortgagee of a new "stripped down" amortization schedule to address only the part of a home mortgage debt secured by the value of a personal residence, *see Nobelman,* 508 U.S. at 331–32, 113 S.Ct. 2106, the Bankruptcy Code contains no provision for nullifying a due-on-transfer clause in a home mortgage while keeping the other provisions of the mortgage intact.

The court in *Garcia,* 276 B.R. at 642, reasoned that:

> a cure of a violation of a due on sale clause should consist of ensuring that the purchaser will not damage or destroy the lender's collateral, and possibly an increase in the interest rate if the market has risen since the loan was originally made.

Mortgagees lend to a specific mortgagor based on the creditworthiness of that particular mortgagor, and frequently sell the mortgages based on the mortgagor's credit rating. To require the mortgagee to dance with a new property owner whose ownership violates the mortgage's due-on-transfer clause (and who is so financially unstable as to have to resort to bankruptcy with the mortgage payments not current) is contrary to the legitimate contractual expectations of the lender, and a prohibited modification under § 1322(b)(2).

Moreover, under *Garcia,* lenders would be subjected to the burden of adducing evidence to demonstrate the unsuitability of the new borrower or the amount of increased interest rate necessary to make them whole based on (1) the change in ownership (as the new borrower may not be as creditworthy as was the original mortgagor when the loan was made), and (2) the changes in market interest rates. That is a litigation morass lenders never contemplated when they looked to the due-on-transfer clause as protection against such changes in ownership. It is one thing for a lender's underwriting department to consider an application to allow transfer of the mortgaged property to a new owner (including that new owner's creditworthiness, and the conditions it would impose to permit such a transfer) (such as increasing the note's interest rate, or insisting upon the new owner's assuming personal liability for the debt). It is quite another thing to place such a decision in the hands of a bankruptcy judge with all of the attendant attorney's fees and costs that litigating such a question would present, and the risk that the judge may make findings that are not consonant with the decision the lender, in the sound exercise of its discretion, would have made to protect its interests.

## IV

### THE PROPRIETY OF ANNULLING THE STAYS

Wells Fargo did not seek relief from the stays before proceeding with foreclosure because it was unaware of Mrs. Allen's bankruptcy case and of her purported 50% ownership interest. The issue is thus one of annulment of the stays.

### A.

### ANNULMENT OF THE AUTOMATIC STAY

■ Based on *Mutual Benefit Life Insurance Co. v. Pinetree, Ltd. (In re Pinetree, Ltd.),* 876 F.2d 34 (5th Cir.1989), annulment of the automatic stay of § 362(a) was appropriate. Here, Mrs. Allen's alleged equitable interest was unenforceable against Wells Fargo because it was not of record when Wells Fargo acquired its interest as mortgagee in the Property. Similarly, Mrs. Allen's recorded interest was ineffective against Wells Fargo to prevent acceleration of the debt because the con-

veyance violated the due-on-transfer clause. In *Pinetree,* the mortgagor conveyed to the debtor ownership of Pinetree Plaza, but the debtor failed to record the deed, and the mortgagee proceeded to foreclose on Pinetree Plaza not knowing that the debtor had filed a bankruptcy case. In annulling the stay in favor of the mortgagee, Mutual Benefit, the court of appeals ruled:

> It is clear that absent bankruptcy, the debtor had no right enforceable against Mutual Benefit by virtue of its unrecorded deed in Pinetree Plaza. Were we to affirm the bankruptcy court's judgment that the automatic stay applied, the parties would be forced to readjudicate its removal, 11 U.S.C. § 362(d), and Mutual Benefit would have to conduct another foreclosure proceeding. Further redundancy and delay would needlessly result. Thus, where a creditor having no knowledge of a pending bankruptcy forecloses in good faith on the collateral, and where the debtor's interest in that collateral is unenforceable against that creditor, and where the debtor, although notified in advance of the foreclosure, failed to assert its status before the foreclosure, we conclude that the automatic stay should have been annulled with respect to the post-bankruptcy foreclosure.

*See also Albany Partners, Ltd. v. West-brook (In re Albany Partners, Ltd.),* 749 F.2d 670, 675–76 (11th Cir.1984) (stay annulled where petition was filed in bad faith and the mortgagee had reason to believe that the property was not part of the bankruptcy estate).

Here the violation of the stays was innocent, and not annulling the stays would subject the third-party purchaser at the foreclosure sale and Wells Fargo to unfair prejudice. Annulling the stay will not deprive Mrs. Allen of her right to use the Bankruptcy Code to obtain a "fresh start" as she was never obligated on the mortgage debt. Nor will annulling the automatic stay deprive her of a right to cure the monetary defaults under the mortgage as the court has already held that it would have granted Wells Fargo relief from the automatic stay. The Bankruptcy Code is not intended as a vehicle for a new owner, whose ownership interest violates the mortgage, to stay foreclosure after the sole mortgagor has exhausted his bankruptcy remedies. Moreover, the amount received at a new foreclosure sale might be less and might not cover the increased amount owed Wells Fargo by the time of the new sale. Finally, the purchaser at the foreclosure sale is an independent third-party which has rights that have intervened.

### B.

### ANNULMENT OF THE CODEBTOR STAY

 The provision for relief from the codebtor stay, 11 U.S.C. § 1301(c),[26] does not expressly mention, as does § 362(d) in the case of relief from the automatic stay, annulment of the stay as a possible form of relief. However, when grounds exist for annulment of the § 362(a) automatic stay, § 1301(c) may be used to annul the codebtor stay as well when it would have been

---

**26.** Section 1301(c) provides:

> (c) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided by subsection (a) of this section with respect to a creditor, to the extent that—
>
> (1) as between the debtor and the individual protected under subsection (a) of this

section, such individual received the consideration for the claim held by such creditor;

> (2) the plan filed by the debtor proposes not to pay such claim; or
>
> (3) such creditor's interest would be irreparably harmed by continuation of the stay.

lifted had relief been sought before fore-closure.[27]

 The court, in any event, has the inherent power and the power under 11 U.S.C. § 105 to grant annulment of the stay in an abusive bankruptcy case when annulment of the automatic stay of § 362(a) is warranted.[28]

As already noted, had Wells Fargo been aware of the case and sought a lifting of the codebtor stay to proceed with foreclosure, relief from the codebtor stay would have been required under § 1301(c)(1) as Mr. Allen, not Mrs. Allen, received the consideration for the claim held by Wells Fargo, and under § 1301(c)(3) as Mrs. Allen never filed a plan. Moreover, this is an abusive bankruptcy case. As in the case of the automatic stay, the circumstances warranted annulling the stay.

## V

## THE ABUSE OF THE BANKRUPTCY SYSTEM MOOTS ANY INQUIRY INTO BAD FAITH, AND, IN ANY EVENT, BAD FAITH WAS PRESENT HERE

The Allens' motion for reconsideration asserts that they did not engage in bad faith. The relief granted here is based on abuse of the bankruptcy system, and when the court finds such abuse, it would seem that "good faith" is absent. Even if abuse of the bankruptcy system does not always equate to a lack of "good faith," the presence of good faith nevertheless would not defeat abuse of the bankruptcy system as a sufficient ground for stay annulment.[29]

## A.

## RELIEF FROM THE EFFECTS OF THIS CASE WAS JUSTIFIED BASED ON ABUSE OF THE BANKRUPTCY SYSTEM (WITHOUT GETTING TANGLED UP IN THE MISLEADING LABEL OF GOOD FAITH)

 The label "good faith" is often used when courts inquire into granting relief from an abusive bankruptcy filing, but that is a misleading label because it suggests that the inquiry always involves a subjective inquiry into whether the debtor viewed the case as proper. Reading such a requirement of intent into the label "good faith" misses the point that dismiss-

27. See Hope v. United Cos. Funding, Inc. (In re Holder), 260 B.R. 571, 577 (Bankr.M.D.Ga. 2001); Harris v. Margaretten & Co., Inc., 203 B.R. 46, 50 (Bankr.E.D.Va.1994) ("there is enough flexibility in § 1301(c) for a court to grant relief appropriate to the circumstances presented, including annulment."); Int'l Harvester Employee Credit Union, Inc. v. Daniel, 13 B.R. 555 (Bankr.S.D.Ohio 1981) (court has same options as under § 362(d), including annulling the stay).

28. There are conceivably cases in which the three alternative grounds of § 1301(c) for relief from the codebtor stay are inapplicable. Nevertheless, if the case is one of abuse, the court has the inherent power and the power under § 105 to annul the case's effects, including the effect of the codebtor stay.

29. There is no controlling decision on the issue in this circuit. In Barnes v. Whelan, 689 F.2d 193, 198–99 (D.C.Cir.1982), the issue was whether the statutory "good faith" requirement for confirmation of a plan required that the plan propose a meaningful repayment of debt. The issue did not involve relief granted based on the filing of the case having constituted an abuse of the bankruptcy process. In holding that "good faith" means honesty of intention, the court did not purport to adopt a subjective test of "good faith" as it expressly premised its holding on the absence of any suggestion that the debtors had engaged in any specific misconduct, or proposed the plan for an improper purpose. Barnes, 689 F.2d at 193. Indeed, the court found it unnecessary to provide a comprehensive definition of "good faith." Id.

al for abuse of the bankruptcy process does not require a finding of knowing abuse of the system. An abusive bankruptcy filing retains that character even if the debtor honestly believed that the filing was proper. Regardless of the debtor's honest belief that the filing was proper, if the filing was an abuse of the bankruptcy system, the court may dismiss the case or grant relief from stays imposed by the Bankruptcy Code.

■■■ As observed in *Little Creek Development Co. v. Commonwealth Mortgage Co. (In re Little Creek Development Co.),* 779 F.2d 1068, 1072 (5th Cir.1986), § 362(d):

> allow[s] relief to be granted "for cause," a term not defined in the statute so as to afford flexibility to the bankruptcy courts. *See, e.g., [In re] Victory Constr. [Co.],* 9 B.R. [549] at 558–60 [(Bankr. C.D.Cal.1981)] ("cause" is any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy process).

Accordingly, a court may grant stay relief, as here, where the petition was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *Albany Partners,* 749 F.2d at 674. *See also In re Laguna Assocs. Ltd. P'ship,* 30 F.3d 734, 737–38 (6th Cir.1994); *Little Creek Dev. Co.,* 779 F.2d at 1071–73. So the court need not decide whether the Allens honestly believed that they were treating Wells Fargo fairly.

### B.

#### "GOOD FAITH" MAY BE FOUND LACKING WHEN IT IS ABSENT ON OBJECTIVE GROUNDS, REGARDLESS OF SUBJECTIVE INTENTIONS

■■■ Stated another way, even when the courts use the "good faith" test in addressing cause for dismissal or lifting of the stay in a bankruptcy case, the test is met when objectively the debtor has abused the bankruptcy system. As the court observed in *Jobin v. McKay,* 84 F.3d 1330, 1335 (10th Cir.), *cert. denied,* 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996), "'good faith' has frequently been construed to include an objective component." As observed in *In re Love,* 957 F.2d 1350, 1357 (7th Cir.1992), "both objective evidence of a fundamentally unfair result and subjective evidence that a debtor filed a petition for a fundamentally unfair purpose that was not in line with the spirit of the Bankruptcy Code are relevant to the good faith inquiry," and "the focus of the inquiry is fundamental fairness." *See also In re Alt,* 305 F.3d 413 (6th Cir.2002) ("[t]he key inquiry in such cases is whether the debtor is seeking to abuse the bankruptcy process.").

As to the precise test to apply, in *In re Lilley,* 91 F.3d 491, 496 (3d Cir.1996) (citations and footnote omitted), the court observed:

> ... "good faith is a term incapable of precise definition." As a result, we believe that "the good faith inquiry is a fact intensive determination better left to the discretion of the bankruptcy court." We therefore join the Seventh, Ninth and Tenth Circuits in holding that the good faith of Chapter 13 filings must be assessed on a case-by-case basis in light of the totality of the circumstances.

The totality of the circumstances here justify a finding of bad faith. The Allens' conduct constitutes an abuse of the bankruptcy system because the petition will delay and frustrate Wells Fargo's legitimate efforts to enforce its mortgage rights after the sole mortgagor was barred from pursuing bankruptcy. As observed by this court in the context of a "new debtor syndrome" case:

The test for dismissal based on bad faith pre-petition transfers of assets to a different debtor has been formulated as "whether any of the substantive or procedural rights of any of the creditors to assets, available prior to the transfer of the property, have been eroded by the transfer and subsequent [bankruptcy] filing."

*In re Franklin Mortgage & Inv. Co., Inc.,* 143 B.R. 295, 300 (Bankr.D.D.C.1992) (citations omitted). Thus, even utilizing the "good faith" test, relief was appropriate in this case.

## VI

## THE ALLENS' EQUITY IN THE PROPERTY AND MR. ALLEN'S ABILITY TO FUND A PLAN ARE IRRELEVANT

The Allens' motion for reconsideration also points to the alleged substantial equity in the Property, and Mr. Allen's ability now to help Mrs. Allen make plan payments. Based on this, they assert that Mrs. Allen's case was filed in good faith.

### A.

## THE FEASIBILITY OF REORGANIZATION DOES NOT PRECLUDE RELIEF FROM THIS ABUSIVE BANKRUPTCY CASE

■ For the reasons articulated in *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.),* 235 F.3d 375, 379–81 (8th Cir.2000), this court declines to follow the *dicta* of *Carolin Corp. v. Miller,*

886 F.2d 693 (4th Cir.1989), that a case may not be dismissed for lack of good faith if there is a realistic possibility of reorganization.[30] Even if reorganization would be possible, that cannot cure a petition that was filed in bad faith or that otherwise constitutes an abuse of the bankruptcy system. *Cedar Shore Resort,* 235 F.3d at 380–81; *Phoenix Piccadilly,* 849 F.2d at 1395; *Franklin Mortgage,* 143 B.R. at 302.[31] Even courts in the Fourth Circuit have treated the *Carolin* test as inapplicable to bad faith serial filings. *See In re Delray Assocs., L.P.,* 212 B.R. 511, 516 (Bankr.D.Md.1997).

### B.

## THE EQUITY IN THE PROPERTY AND THE PREJUDICE TO THE ALLENS IS NOT A BASIS FOR DENYING ANNULMENT OF THE STAY

■ The Allens point to the alleged substantial equity in the Property in contending that Wells Fargo has not been prejudiced, and that the Allens will be. However, a chapter 13 bankruptcy case is not intended to be used as a vehicle to suspend mortgage payments while pursuing a sale or refinancing of the mortgagor's principal residence. *See* 11 U.S.C. § 1322(b)(2) (a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence"). The only exception to this anti-modification requirement

---

**30.** The test set forth by *Carolin* was *dicta:* even under the more stringent *Carolin* test, dismissal was appropriate in *Carolin,* and no court of appeals has **held** that the *Carolin* test actually applies.

**31.** The lack of any realistic possibility for a reorganization is a basis for dismissal under express provisions of the Bankruptcy Code,

and hopelessness of reorganization may be a sign of bad faith. The court of appeals in *Carolin* fell into the error of reasoning that the converse is true (if reorganization is not hopeless, then bad faith cannot exist), and failed to recognize that hopelessness of reorganization is but one subset of bad faith filings.

is that a debtor is permitted to propose a plan providing for a cure of defaults while maintaining payments. *See* 11 U.S.C. § 1322(b)(5). And, as noted, Mr. Allen failed to maintain payments in his bankruptcy case. Mr. Allen had the opportunity for more than a year after Mr. Allen filed his case to effect a sale of the Property, but based on the dismissal of his bankruptcy case with prejudice, he was not entitled to utilize bankruptcy once again to delay Wells Fargo's payment rights. The Allens' attempt to procure more time to sell or obtain refinancing, by having Mrs. Allen file a case, and thereby to obtain a bankruptcy stay—on the basis of an ownership interest that contravenes the Deed of Trust—constitutes an abuse of the bankruptcy system, and bad faith, regardless of the prejudice to the Allens.

### VII

■ Wells Fargo never learned prior to the foreclosure sale of Mrs. Allen's bankruptcy case and her ownership of an interest in the Property. Mr. Allen's affidavit, received in evidence, recites:

> [O]n or about the 25th or 26th day of March 2003, I notified the office of David W. Draper, Jr. Esq., Attorney of Record for Wells Fargo and Option One Mortgage Company and informed them of Thelma Allen's bankruptcy filing. I called (703) 777-2448 and was received by a voice mail recording. I then left a detailed message stating the case no. of Thelma Allen's Chapter 13 filing and the date of the filing which was March 24, 2003. I also requested a return call and left my telephone number (202)797-9550. To date I have not received a response to my message.

However, the law firm he called maintains a log of telephone calls received at the 777-2448 number, and that log reflects no call received on March 25 or 26, 2003,

referring to either Mr. or Mrs. Allen. The court credits the testimony of the law firm's employee that the log is accurate as to the calls that were listened to after voice mail messages were received. The court need not find that Mr. Allen did not make the call that he contends he made. As he brought out on cross-examination of the law firm's employee, it is possible that the call was made but the voice mail message was skipped altogether. Or perhaps one of the employees erased the message prematurely. The court specifically finds that the law firm and its employees never became aware of a voice mail message left by Mr. Allen, whether because he never left such a message or because it was somehow not recorded or otherwise not listened to.

The Allens' contention that the court ought not have received the employee's testimony is rejected. The Allens raised no objection to the testimony, and thus waived the objections that they belatedly seek to raise.

As to their contention that an adverse inference should be drawn from Wells Fargo's failure to place the telephone log in evidence, the simple point is that at the hearing on the annulment motion they did not ask to see the logs or to receive an explanation for their not being placed in evidence. For all we know, they may have been in the courtroom. Instead, at the hearing the Allens focused on the telephone messages themselves having been erased, a point that the Allens do not renew in the motion for reconsideration.

Even if Mr. Allen left the voice mail message he says he left, Mr. Allen's efforts at giving the law firm notice were inadequate. Reasonable prudence dictated that he notify the law firm in writing to memorialize precisely what information he communicated. Moreover, when he called the law firm, he did not exercise the option,

provided by the law firm's voice mail system (*see* Tr. at 20), of bypassing the voice mail to speak to a live person during normal business hours (8:00 to 5:00) so there would be no possibility that the message would be missed. Instead, he trusted in leaving a voice mail message, whose terms he obviously cannot recall verbatim.

Even as described by him, the voice mail message was at best sketchy. His affidavit, quoted above, recites only that he stated the case number of Thelma Allen's Chapter 13 filing and the date of the filing which was March 24, 2003, and that he requested a return phone call. Even at the hearing, when asked how long the phone call was, he stated:

> Well, it was enough to state the name of the case, the date of the filing, and my return phone number, you know, and ask him to give me a call so we can discuss, you know, were we go from here as a result of those filings. I would guess [the call] was less than two minutes.

Tr. at 13. That would have been inadequate to place Wells Fargo on notice of a bankruptcy case that could affect the foreclosure sale regarding **Mr. Allen's debt** and **Mr. Allen's property.** When pressed further, he represented at the hearing (without testifying) that, word for word, he said:

> I said, "Mr. Goldberg, this is Charles Allen, there has been a bankruptcy case filed by my co—" my tenant-in-common, I believe I used the word tenant-in-common, Thelma Allen, "and it was filed on the 24th," and I gave the case number, 03–00571, and I gave him my number to get back to me so we—I said, "When you call me at area code 202–97–9550, to explain what our options are in terms of where we go from here, in terms of the foreclosure sale scheduled on the 27th."

In prompting by the court as to whether he mentioned the lender, he stated that he additionally recited that he stated in the message that "I wasn't too sure if this message should be left with you or [Wells Fargo]." Tr. at 18. That is why he left his phone number for Goldberg to call him back because he was not sure what to do. *Id.* Even had these representations been given as testimony, the court declines fully to credit them: they are self-serving representations that were not included in his affidavit (one must ask why they were not on an issue of such importance), and that concern an oral message Mr. Allen left when he was under great stress and anxiety regarding the potential loss of the Property to foreclosure, such that he was likely somewhat excited and hence not of such a clear mind that would be more readily conducive to accurate recall at this late date. Moreover, Mr. Allen, an attorney who litigates criminal cases, readily concedes that he is not sophisticated in bankruptcy matters, and the court questions whether he appreciated the precise type of information he was obliged to leave to put Wells Fargo on notice of an automatic stay having arisen as to its impending foreclosure sale by virtue of a stranger to the mortgage relationship having filed a bankruptcy case.

Even if credited, Mr. Allen's representations still would fail to make the message sufficiently definite to put Wells Fargo on reasonable notice that Mrs. Allen's bankruptcy case gave rise to an automatic stay against Wells Fargo foreclosing against the Property. The term "my tenant-in-common" conveyed insufficient detail (assuming Mr. Allen indeed used that term instead of just believing he used it). Without the message specifically tying that cotenancy to the Property (which was Wells Fargo's collateral and which, as far as it knew, was solely owned by Mr. Allen), a

co-tenant relationship between the two Allens would be irrelevant, and Wells Fargo could not be deemed to have been left a message reasonably calculated to notify it of an automatic stay applying as to the Property securing repayment of Mr. Allen's debt.

Moreover, Mr. Allen was derelict in not taking adequate follow-up steps to verify that Wells Fargo had received and understood his message. When no one made a return call to Mr. Allen as he had requested because, as he himself states, he was not sure what to do, and particularly because he was uncertain whether he had contacted the appropriate office to stop the foreclosure sale, he unreasonably failed to make an effort to contact the law firm anew to insist on talking to an attorney or other live body. Nor did he attend the foreclosure sale to announce that a bankruptcy case had been filed.

### VIII

An order follows denying the Allens' motion for reconsideration.